# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| **JOSEPH L. BURNS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| **v.** | § | |
| | § | **EP-17-CV-00264-DCG** |
| **KIRSTJEN NIELSEN,** *Secretary, U.S.* | § | |
| *Department of Homeland Security*, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Presently before the Court is Defendant Chad F. Wolf's[1] ("Secretary") "Renewed Motion

for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial and Motion for

Remittitur" (ECF No. 119), as supplemented by his "Supplemental Renewed Motion for

Judgment as a Matter of Law, or in the Alternative, Motion for New Trial and Motion for

Remittitur" (ECF No. 146).[2]  Plaintiff Joseph L. Burns, who works for the U.S. Customs and

Border Protection (Agency or CBP), brought this lawsuit against the Secretary for the Agency's

violations of § 501 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 791, and in turn, for

violations of Title I of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12111 *et*

*seq*.  Burns's disability discrimination claims, 42 U.S.C. § 12112(a), and improper medical

inquiry claim, 42 U.S.C. § 12112(d)(4), were tried to a jury.  The jury found in Burns's favor on

each claim and awarded him $125,000 in past noneconomic damages.  After the Court entered

final judgment in accordance with the jury verdict and the parties' stipulation on back pay, the

---

[1] Chad F. Wolf, Acting Secretary of the United States Department of Homeland Security, is the successor in office to Kirstjen Nielsen.  Mr. Wolf was named Acting Secretary on November 13, 2019.  In accordance with Federal Rules of Civil Procedure 25(b), Mr. Wolf is hereby automatically substituted as a party in this litigation for the previous officeholder.

[2] The supplemental motion differs from the original motion only by the inclusion of citations to trial transcripts, which were not available at the time the original motion was filed.

Secretary filed the instant motion.  For the reasons that follow, the Court **DENIES IN MAJOR PART** and **GRANTS IN PART** the Secretary's motion.

## I.   BACKGROUND

### A.   Factual Background

Burns suffers from chronic migraine headaches; he was first diagnosed with a migraine condition in 1998, while he was serving in the United States Air Force.[3]  In August 2012, he began working for the Agency's Office of Information Technology (OIT), West Texas Branch, and he continues to work there today.[4]  The branch maintains tactical communication, surveillance, and detection systems used by the Agency's law enforcement officers in the field and at various border patrol stations throughout the El Paso, Texas, area.[5]  Burns works as a Field Technology Officer (FTO), a telecommunications specialist position, at the branch's office in El Paso, Texas.[6]

As an FTO, Burns is responsible for maintaining and repairing motion sensors, sensor repeaters, and surveillance equipment, such as cameras, used by the Agency's radio and video surveillance systems (RVSS).[7]  Most of the time, he works is his office, but at times, he goes out in the field and climbs poles and towers that host sensors and RVSS equipment.[8]  FTOs, such as

---

[3] Pl.'s Ex. 15, ECF No. 99-15; Burns Tr. at 13:13–22, ECF No. 133.

[4] Pl.'s Ex. 6, ECF No. 99-6; Joint Ex. 1 at ¶ 3, ECF No. 100-17.  The Agency is a part of the Department of Homeland Security (DHS).

[5] Yrrobali Tr., vol. 1, at 3:17–4:6, ECF No. 131.

[6] Joint Ex. 1 at ¶ 3.

[7] Joint Ex. 1. at ¶ 5; Burns Tr. at 4:7–14, 5:7–22.

[8] Burns Tr. at 7:8–8:24.

Burns, receive "hazard pay" for climbing towers at an additional 25% of their daily base pay.[9]
They climb towers in teams of two: typically, one remains on the ground, while the other
climbs.[10]  One of the duties of a tower climber is to rescue his partner in the event something
happens to the latter.[11]  To perform tower climbing duties, an FTO must initially become
certified as a climber and thereafter, be recertified annually by attending training classes, which
are offered once each year.[12]  Burns is a certified climber and has been recertified each year since
he began working for the Agency, with the exception of the 2016–2017 period.[13]

Richard Apodaca was Burns's direct supervisor for some time until Markus Yrrobali was
promoted to that position.  Apodaca joined the Agency in 2012: initially, he was Burns's
colleague, and in 2014, he became Burns's supervisor.[14]  In December 2015, Yrrobali took over
from Apodaca and became Burns's supervisor. [15]  Before that, Yrrobali was an FTO and Burns's
colleague; he occasionally climbed towers with Burns.[16]  Also before Yrrobali's promotion, both
Apodaca and Yrrobali knew about Burns's migraine condition.[17]  Both testified that Burns never
was involved in any climbing accident or unsafe practice.[18]

---

[9] Yrrobali Tr., vol. 1, at 12:20–24; Pl.'s Ex. 11, ECF No. 99-11; Joint Ex. 1 at ¶ 8.

[10] Yrrobali Tr., vol. 1, at 12:25–13:10; Joint Ex. 1 at ¶ 6.

[11] Burns Tr. at 8:25–9:3; Joint Ex. 1 at ¶ 6.

[12] Yrrobali Tr., vol. 1, at 13:11–14:9; Burns Tr. at 10:23–11:24.

[13] *See* Burns Tr. at 11:25–12:12.

[14] Apodaca Tr. at 5:1–13, ECF No. 137.

[15] *Id.*; Yrrobali Tr., vol. 1, at 7:17–19.

[16] Yrrobali Tr., vol. 1, at 35:2–5, 36:23-37:18, 38:4–7.

[17] *Id.* at 37:6–18; Apodaca Tr. at 11:18–12:8.

[18] Yrrobali Tr., vol. 1, at 34:10–21, 35:20–36:93, 36:10–18, 39:16–19; Apodaca Tr. at 8:13–25.

Apodaca testified that around January 2016 or shortly thereafter, Jean Molinar told him that the RVSS crew had a concern about Burns's climbing while having migraines, and Apodaca relayed that information to Yrrobali.[19]  At the time, Molinar was a "mission support specialist" with the OIT and worked in the same El Paso office where Apodaca, Yrrobali, and Burns work.[20] Molinar, whose deposition testimony was presented to the jury by a "reader," testified that she never told Apodaca about any report of safety concerns regarding Burns.[21]  She added that no one, including the RVSS team members, reported to her any safety concern about Burns.[22]

Yrrobali testified that the information conveyed by Apodaca prompted him to seek out guidance from Victor Fernandez, an area manager in the OIT who oversees FTO supervisors, including Apodaca and Yrrobali, and Fernandez, in turn, directed Yrrobali to contact Maria Benn, a human resource specialist in the Agency's Labor and Employment Relations (LER) division.[23]  According to Yrrobali and Benn, on or about March 11, 2020, the two briefly met during a training class in El Paso: Yrrobali told her that some employees had concerns about climbing towers with an employee who had migraines, and Benn asked Yrrobali to send her an email with specific and further information about the issue.[24]

---

[19] Apodaca Tr. at 10:11–13, 30:4–11; *see also* Yrrobali Tr., vol. 1, at 44:25-45:17.

[20] A mission support specialist is a human resource representative or liaison for the OIT.  Liab. Trial Tr., vol. 4, at 266:16–268:7, ECF No. 149; Yrrobali Tr., vol. 1, at 53:10–13; Yrrobali Tr., vol. 2, at 160:21–22, ECF No. 132.  Molinar retired from the Agency on April 30, 2016.  Liab. Trial Tr., vol. 4, at 267:13–14.

[21] Liab. Trial Tr., vol. 4, at 277:21–278:19.

[22] Liab. Trial Tr., vol. 4, at 273:23–276:10, 276:9–10, 279:11–12.

[23] Yrrobali Tr., vol. 1, at 54:7-22, 77:21–23; *see also* Yrrobali Tr., vol. 1, at 7:6–7; Fernandez Tr. at 3:20–4:18 (regarding Fernandez's position), ECF No. 140; Benn Tr. at 3:23–4:19 (regarding Benn's position), ECF No. 134; Joint Ex. ¶¶ 11–12 (regarding Fernandez's and Benn's positions).

[24] Yrrobali Tr., vol. 1, at 55:14–59:3; Yrrobali Tr., vol. 2, at 109:22–25, 110:21–111:12, Benn Tr. at 34:25–37:4.

On March 14, 2016, Yrrobali sent Benn an email with a subject-line heading, "Medical issues that will affect an employee[']s pay (Restrictions at work for medical reasons)"; on the email, he copied Fernandez and Apodaca.[25]  In the email, Yrrobali provided information about, *inter alia*, the circumstances of the safety concern and the effects Burns's chronic migraine condition has on his work (this information is discussed more fully later in this memorandum opinion and order).[26]  At the time Yrrobali wrote this email, he had not spoken with Molinar, Burns, or any of the RVSS team members regarding the safety concern relayed to him by Apodaca.[27]  At the conclusion of the email, Yrrobali asked Benn whether he should restrict Burns from climbing towers pending the receipt of a memo from Burns's doctors approving or disapproving his climbing; Yrrobali explained that the restriction would affect Burns's hazard-duty pay, "since [the OIT's] climbers receive 25% of their base pay extra for each day they climb."[28]

Benn testified that because of the manner in which Yrrobali wrote the email, she got the impression that his statements in the email were based on his personal observations and first-hand knowledge, and that Yrrobali had conducted an investigation, including speaking with Burns and his coworkers who had safety concerns about Burns.[29]  Based on Yrrobali's email, Benn recommended that Burns be requested to provide medical documentation from his doctors

---

[25] Pl.'s Ex. 11.

[26] *Id.*  This email was front and center at trial.  Multiple witnesses, including Apodaca and Yrrobali, testified at length about the information Yrrobali provided in the email.

[27] Yrrobali Tr., vol. 1, at 60:15-62:1, 82:17–23; Burns Tr. at 25:22–26:3.

[28] Pl.'s Ex. 11.

[29] Benn Tr. at 10:1–14, 29:12–22, 30:11–14.

and be restricted from climbing duties pending his doctors' response.[30]  She drafted a letter to that effect for Yrrobali to serve on Burns.[31]

On April 6, 2016, Yrrobali issued the letter to Burns.[32]  The letter requested Burns to submit "administratively acceptable medical documentation" from his physician providing, among other medical information, a diagnosis of Burns's conditions and any resulting impairments, an explanation of the impact his conditions were having on his life activities, and an opinion as to whether or not he was a danger to himself or others.[33]  The stated purpose for requesting the medical information was "to evaluate [Burns's] ability to perform the hazardous duty portion (Tower Climbing) of [his] official duties of a Telecommunications Specialist."[34]  Further, the letter instructed Burns to refrain from climbing towers pending response from his physician.[35]

On April 27, 2016, Burns provided Benn and Yrrobali with a letter, dated April 26, 2016, from Dr. Robbie Rampy, a physician at the Department of Veterans Affairs.[36]  In the letter, Dr. Rampy stated that Burns has chronic migraine headaches and degenerative disc disease of the lumbar spine.[37]  He opined that some of Burns's medications could cause drowsiness and

---

[30] Benn Tr. at 10:25–11:19, 43:14–19, 44:4–7, 44:24–45:7; Yrrobali Tr., vol. 1, at 84:16–18, 127:24–25; Pl.'s Ex. 12, ECF No. 99-12.

[31] Yrrobali Tr., vol. 1, at 124:10–21, 127:15–23; Pl.'s Ex. 12.

[32] Pl.'s Ex. 13, ECF No. 99-13.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] Pl.'s Ex. 15; Pl.'s Ex. 16, ECF No. 99-16.

[37] Pl.'s Ex. 15.

recommended that Burns not climb a tower when he is drowsy.[38]  He further opined that Burns did not appear to be a danger to himself or others, but added that because he is not a behavioral health specialist, he could not comment on this matter without resorting to speculation.[39]

Benn determined that Dr. Rampy's letter was vague and should be forwarded to the nurses within the Agency's Medical Fitness Branch (MFB), so that they could determine whether it was acceptable.[40]  On April 28, 2016, Benn emailed to Mary Thomas, an MFB nurse, Dr. Rampy's letter together with Yrrobali's March 14, 2016 email to Benn and his April 6, 2016 letter to Burns.[41]  In her email, Benn asked Thomas if Dr. Rampy's letter was acceptable and if Burns's case merits a fitness for duty evaluation.[42]  On May 5, 2016, Thomas responded that Dr. Rampy's letter was inadequate for purposes of determining whether Burns could safely resume his full range of duties.[43]  Thomas recommended that Burns's management ask him to provide additional information from his physician and continue to limit him to non-hazardous duties pending clarification from his physician.[44]  On July 7, 2016, Benn sent Yrrobali a second letter requesting medical documentation for Yrrobali to serve on Burns; Benn drafted that letter as well.[45]

---

[38] Pl.'s Ex. 15.  At trial, Burns testified that Dr. Rampy prescribed him Triptan for his migraines. Burns Tr. at 70:11–17.  Burns takes over the counter medication to alleviate his headaches, but if they get worse, he takes Triptan.  *Id.* at 56:21–23, 60:9–15.

[39] *Id.*

[40] Pl.'s Ex. 16; Benn Tr. at 48:9–15, 50:3-24, 52:2–17.

[41] Pl.'s Ex. 17, ECF No. 99-17.

[42] *Id.*; Yrrobali Tr., vol. 1, at 175:18–20.

[43] Pl.'s Ex. 20, ECF No. 99-20.

[44] *Id.*

[45] Pl.'s Ex. 22 at 2, ECF No. 99-22; Benn Tr. at 55:13–18; Yrrobali Tr., vol. 2, at 54:13–55:7.

On August 18, 2016, Yrrobali attempted to serve Burns with the second letter, but Burns, according to Yrrobali's testimony, declined to sign the letter and thereby, to acknowledge its receipt because he felt uncomfortable.[46]  Yrrobali ultimately served the letter on August 28, 2016.[47]  The letter informed Burns that Dr. Rampy's letter was insufficient for purposes of determining whether he could resume his hazardous duties.[48]  It instructed him to provide from his treating physician, among other information, "a brief description of [Burns's] current medical status and use of potentially sedating medications" and an opinion as to whether his medical conditions and use of medications impeded his ability to climb towers and to respond to off-hours emergencies.[49]

In the meantime, on August 23, 2016, Burns sent an email to Yrrobali, Fernandez, and Benn, expressing his frustration at the Agency's repeated requests for medical information.[50]  In it, he wrote that he felt harassed and discriminated against based on a disability that was never questioned before and that this had been a stressful time for him both on and off the job in dealing with the Agency's actions.[51]  On the email, Burns copied his union representatives and a law firm.[52]

On September 14, 2016, Yrrobali served a third letter on Burns.  In that letter, Yrrobali rescinded the request for medical documentation he made in his August 18, 2016 letter; Burns

---

[46] Pl.'s Ex. 24, ECF No. 99-24; Yrrobali Tr., vol. 2, at 53:20–54:12; Burns Tr. at 31:24–32:1.

[47] Pl.'s Ex. 22; Pl.'s Ex. 23, ECF No. 99-23.

[48] Pl.'s Ex. 23.

[49] *Id.*

[50] Pl.'s Ex. 25, ECF No. 99-25; *see also* Burns Tr. at 33:24–34:21, 83:23–84:5.

[51] *Id.*

[52] Pl.'s Exs. 22, 25; Burns Tr. at 72:10–12, 84:8–19.

was no longer required to provide any further medical documentation.[53]  Further, Yrrobali

instructed: "concerned for your safety and the safety of others, you must not climb towers when

you have taken the prescribed medication Dr. Rampy referenced.  You must immediately notify

your supervisor that you have taken the prescribed medication to make other work

arrangements."[54]  Burns needed to so notify, Yrrobali clarified in an email on September 15,

2016, only if Burns takes such medications prior to any assignment for climbing or hazardous

duty task is made by his supervisor or any request for assistance with such task is made by

another FTO.[55]

   Benn testified that she drafted the September 14, 2016 letter for Yrrobali, but the idea for

rescinding the August 18, 2016 request for medical documentation came from Yrrobali and

Fernandez; it was not her recommendation.[56]  Yrrobali testified that when he first attempted to

serve Burns with the August 18, 2016 letter, Burns inquired why he could not simply inform

Yrrobali when he took medications or had migraines before any climbing duties.[57]  Yrrobali

believed that Burns's suggestion was a possible mitigation solution: it mitigated the concern

brought to Yrrobali by Apodaca.[58]  Burns testified that he did not make that suggestion.[59]

---

[53] Pl.'s Ex. 26, ECF No. 99-26; Yrrobali's Tr., vol. 2, at 90:12–14.

[54] Pl.'s Ex. 26.

[55] Pl.'s Ex. 27, ECF No. 99-27; Yrrobali's Tr., vol. 2, at 94:6–25.

[56] Benn Tr. at 22:14–24, 23:6–17, 24:3–14, 57:1–24, 58:9–16.

[57] Yrrobali Tr., vol. 2, at 157:19–158:3.

[58] *Id.* at 92:17–21, 158:4–19, 180:23–181:11.

[59] Burns Tr. at 87:20–25.

At all times relevant, Burns received full base pay and benefits.[60]  Burns testified that

beginning with Yrrobali's April 6, 2016 letter, he could not climb towers because of the climbing

restriction then in effect and consequently lost hazard pay for any tower climbing opportunities.[61]

He added that because of the climbing restriction, he also missed an annual tower climbing

recertification class held between April 6 and September 14, 2016; the class requires an attendee

to climb a tower and demonstrate climbing proficiency.[62]  He was able to attend the next

recertification class held in May 2017.[63]  As a result, Burns testified, although Yrrobali's

September 14, 2016 letter allowed him to resume tower climbing duties, for lack of

recertification, he could not climb towers, and lost hazard pay, for almost a year in total.[64]

## B.  Procedural Background

On August 24, 2017, Burns brought the instant lawsuit against the Secretary for

violations of § 501 of the RA, 29 U.S.C. § 791.  Compl. at ¶ 12 (listing also ADA Title I), ECF

No. 1.  At the summary judgment stage, the Court dismissed Burns's retaliation and hostile work

environment claims, but allowed his disability discrimination and improper medical inquiry

claims to proceed to trial.  *Burns v. Nielsen*, 456 F. Supp. 3d 807, 831 (W.D. Tex. 2020).

Following jury selection on February 3, 2020, the liability phase of the trial began on

February 4 and concluded on February 7.  The jury found for Burns on each of his three claims.

Verdict Form, ECF No. 105.  Specifically, the jury found, for purposes of Burns's claims under

---

[60] *Id.* at 54:18–23.

[61] *Id.* at 29:17–28:1.

[62] *Id.* at 10:23–12:7, 76:9–14; *see also* Yrrobali Tr., vol. 1, at 13:11–14:9.

[63] Burns Tr. at 37:15–16; Joint Ex. at ¶ 25.

[64] Burns Tr. at 12:8–12, 37:12–23.

42 U.S.C. § 12112(a) as incorporated by reference in § 501 of the RA, that the Agency removed Burns from tower climbing duties because of his disability and his being regarded as having migraines. *Id.* It further found, for purposes of Burns's claims under 42 U.S.C. § 12112(d)(4) as incorporated by reference in § 501 of the RA, that the Agency made a disability-related inquiry of Burns but the Agency did not have a reasonable belief based on objective evidence either that Burns's ability to perform essential job functions will be impaired by a medical condition or that that Burns will pose a direct threat due to a medical condition. *Id.*

On February 10, 2020, the damages phase of the trial was held, and the jury awarded Burns $125,000 for past pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life and $0 for future pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life. Verdict Form for Damages, ECF No. 109. Before trial, the parties had stipulated that Burns lost hazard pay in the amount of $3,068.56 for the period between April 6, 2016, and May 3, 2017. Joint Ex. 1 at ¶ 26.[65] The jury was informed of the stipulation, but it was not asked to make any determination about back pay. Ct.'s Instrs. to Jury on Damages at 2, ECF No. 108. In accordance with the parties' stipulation and the jury verdict, the Court entered final judgment on February 25, 2020, awarding Burns $3,068.56 as back pay and $125,000 as compensatory damages. Final J., ECF No. 115.

On March 24, 2020, the Secretary filed, together with a leave motion, the instant "Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial and Motion for Remittitur" (ECF No. 119), and on March 31, 2020, Burns filed a response in opposition to the Secretary's motion (ECF No. 120). On April 6, 2020, the Secretary moved for

---

[65] *See also* Damages Trial Tr., vol. 3, at 16:1–2 ("The parties agreed even before this trial began that the economic loss to Mr. Burns was $3,068.56." (closing argument by defense counsel)), ECF No. 154.

extension of time to file his reply brief until 14 days after he receives the complete trial transcript

from the court reporter.  Def.'s Unopposed Mot. for Extension of Time to File Reply at ¶ 14,

ECF No. 121.  The Secretary also requested that he be allowed to amend his motion with

citations to the anticipated complete trial transcript.  *Id.*  On May 11, 2020, the Court granted the

motion for extension of time.

Meanwhile, on April 24, 2020, the Secretary appealed from the Court's final judgment.

Notice of Appeal, ECF No. 23.  The appeal is currently pending before the Fifth Circuit (court of

appeals docket number 20-50342).

Between August 7 and 10, 2020, the trial transcripts were made available to the parties

and the Court.[66]  After securing another extension of time, the Secretary filed his "Reply to

Plaintiff's Response in Opposition to Defendant's Renewed Motion for Judgment as a Matter of

Law, or in the Alternative, Motion for New Trial and Motion for Remittitur" (ECF No. 143) on

August 31, 2020.  The Secretary also filed the "Supplemental Renewed Motion for Judgment as

a Matter of Law, or in the Alternative, Motion for New Trial and Motion for Remittitur" (ECF

No. 146), which was docketed on September 28, 2020.  On September 25, 2020, the Court

ordered Burns to file a supplemental response to the Secretary's motion—but with citations to

the trial transcripts.  Order Regarding Suppl. Resp. by Pl., ECF No. 145.  After the Court granted

Burns an extension of time, he filed his "Amended Supplemental Response in Opposition to

---

[66] The Secretary made two requests for trial transcript: one made on February 21, 2020, which was the subject of his motion for extension of time and sought transcripts of certain witnesses' testimony presented during the liability phase of the trial, *see* Tr. Order, ECF No. 113, and the other made on May 8, 2020 (after the Secretary filed the notice of appeal), which sought complete transcript of the trial, including the damages phase of the trial, *see* Tr. Order, ECF No. 126.

Between August 7 and 10, 2020, the court reporter delivered the transcripts (ECF Nos. 131–139) responsive to the Secretary's first request, and on September 30, 2020, the reporter delivered the transcripts (ECF Nos. 147–154) responsive to the Secretary's second request.  Because in their supplemental briefs, the parties cite to the first set of the transcripts, in this memorandum opinion and order, the Court relies primarily on that set and where necessary, to some extent, on the second set.

Defendant's Renewed Judgement as a Matter of Law, Motion for New Trial and Motion for Remittitur" (ECF No. 161), which was docketed on October 13, 2020.[67]

## II.   STANDARD

### A.  Judgment as a Matter of Law

Judgment as a matter of law is appropriate if there is no "legally sufficient evidentiary basis" for "a reasonable jury . . . to find for the party on that issue" on which it prevailed at trial. Fed. R. Civ. P. 50(a); *Laxton v. Gap Inc*., 333 F.3d 572, 577 (5th Cir. 2003).  "Evidence is legally insufficient where the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict." *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins.*, 898 F.3d 461, 473 (5th Cir. 2018) (internal quotes and citation omitted).

Courts "accord great deference to the jury's verdict when evaluating the sufficiency of the evidence." *Thomas v. Texas Dep't of Criminal Justice*, 220 F.3d 389, 392 (5th Cir. 2000). The court "must examine the evidence as a whole," *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 494 (5th Cir. 2019), and "draw all reasonable inferences in the light most favorable to the verdict," *Allstate Ins. v. Receivable Fin. Co.*, 501 F.3d 398, 405 (5th Cir. 2007) (internal quotes and citation omitted).  In that light, the court asks whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assur. Co. v. United Space Alliance, LLC*, 378 F.3d 482, 487 (5th Cir. 2004) (same).  In doing so, the court must "credit[ ] the non-moving party's evidence and disregard[ ] all evidence favorable to the moving party that the jury is not required to believe." *Apache Deepwater, L.L.C. v. W&T Offshore, Inc*., 930 F.3d 647, 653 (5th Cir. 2019) (same).  It "may not make

---

[67] Throughout this opinion, the Court relies on and cites to the parties' briefs that include citations to the trial transcripts, *see* Def.'s Suppl. Mot., ECF No. 146; Pl.'s Suppl. Resp., ECF No. 161; Def.'s Reply, ECF No. 145, instead of the original briefs that do not include such citations.

credibility determinations or weigh the evidence, as those are jury functions." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016) (same).

## B.  Motion for a New Trial

Rule 50 also provides that a party "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b); *Long v. Shultz Cattle Co.*, 881 F.2d 129, 132 (5th Cir. 1989) (An alternative motion for a new trial "may be granted even if the moving party is not entitled to judgment as a matter of law."). Rule 59(a) provides that a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Though undefined by the Rule, a district court may grant a new trial if, for example, it finds that "the verdict was against the weight of the evidence," or "the damages awarded were excessive." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 784 (5th Cir. 2018) (brackets, internal quotes, and citation omitted). "A motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." *Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 497 (5th Cir. 2002).

The decision to grant or deny a motion for a new trial, including the determination of whether a verdict is against the great weight of the evidence, is a question committed to the district court's sound discretion. *Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 230 (5th Cir. 2020); *Foradori v. Harris*, 523 F.3d 477, 503–04 (5th Cir. 2008). This discretion is even broader when the district court denies, rather than grants, such a motion. *Compare Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005) ("Where a motion for a new trial is granted, we scrutinize that decision more closely," because "the broad discretion allowed to the trial court is tempered by the deference due to a jury" (internal quotes and citation omitted)), *with Whitehead*

*v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998) ("It goes without saying that review of the denial of a new trial motion is more limited than when one is granted. The denial will be affirmed unless, on appeal, the party that was the movant in district court makes a clear showing of an absolute absence of evidence to support the jury's verdict, thus indicating that the trial court had abused its discretion in refusing to find the jury's verdict contrary to the great weight of the evidence." (internal quotes and citation omitted)).

## III.   DISCUSSION

In his motion, the Secretary advances a plethora of arguments, some of which suffer from inadequate briefing, lack citation to authorities, or are raised for the first time here. His chief arguments are as follows. He argues that the Court's jury instruction on the causation element of the actual disability discrimination claim was improper. Def.'s Suppl. Mot. at 5–6, ECF No. 146. Next, he argues, there is insufficient evidence to support the jury's finding of discrimination based on disability and its findings in favor of Burns on his claim of improper medical inquiry. Def.'s Suppl. Mot. at 6, 20. He adds that there is insufficient evidence to support the jury's award of $125,000 for Burns's past noneconomic damages. *Id.* at 23. As relief, the Secretary asks the Court to grant judgment as a matter of law in his favor, and in the alternative, to hold a new trial on liability and damages. *Id.* at 27. Alternatively, he asks the Court to remit the jury award to a nominal amount. *Id.* at 25, 27.

## A.  Challenge to the Court's Jury Charge

On the causation element of Burns's claim for discrimination based on actual disability, the Court instructed the jury as follows:

> Sixth. The Agency removed Plaintiff Joseph Burns from tower climbing duties because of his disability. *Plaintiff Joseph Burns does not have to prove that his disability was the only reason the Agency removed Plaintiff Joseph Burns from tower climbing duties.*

Ct.'s Instrs. to Jury at 11 (boldface omitted; italicized emphasis added), ECF No. 102.[68]  The

charge adopted the "because of" formulation of the element—one of three optional formulations

recommended in the Fifth Circuit's pattern jury instructions.  *See* Fifth Cir. Pattern Jury Instrs. at

182 & n.9 (2014) [hereinafter "Fifth Cir. PJI"].

    At charge conference, the Secretary objected to the second sentence (italicized above) of

the charge on the ground that it implies a "motivating factor" standard and is inconsistent with

the first sentence in light of *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), a case

under the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended,

29 U.S.C. § 621 *et seq.*  Liab. Trial Tr., vol. 6, at 60:20–61:24 (statement of defense counsel),

ECF No. 151.  Lurking behind this argument is the Secretary's implicit position that the

"because of" standard as interpreted by *Gross* requires Burns to show that his disability was the

"sole cause" of the complained-of adverse action.  *See* Pl.'s Suppl. Resp. at 6.  In addition, in the

instant motion, the Secretary broadly argues that the Court should have instructed the jury with

the "but-for" standard of causation described in *Gross*.  Def.'s Suppl. Mot. at 5–6.

    Before addressing the merits of the Secretary's arguments, the Court discusses the state

of the ADA's causation standard in the Fifth Circuit and the potential impact of the Supreme

Court's recent decisions, including *Gross*, on that standard—the backdrop against which the

Court instructed the jury as it did.  *See* Fifth Cir. PJI at 178 ("The causation standard in ADA

cases may be in flux.").

---

[68] *See also* Verdict Form at 1 ("With regard to Plaintiff's Claim 1 (Discrimination Based on Disability), has Plaintiff Joseph L. Burns proved by a preponderance of the evidence that the Agency removed Plaintiff Burns from tower climbing duties because of his disability?" (emphasis added)), ECF No. 105.

As an initial matter, Burns brought this action pursuant to § 501 of the RA, 29 U.S.C. § 791.  Compl. ¶ 12.[69]  Section 501 itself incorporates the standards of Title I of the ADA, 42 U.S.C. § 12111 *et seq.*, for determining whether there has been disability discrimination by a federal agency employer.  *See* 29 U.S.C. § 791(f); *Pinkerton v. Spellings*, 529 F.3d 513, 516–17 (5th Cir. 2008); *Atkins v. Salazar*, 455 F. App'x 385, 391 (5th Cir. 2011).  The ADA, as amended by the ADA Amendments Act of 2008 (ADAAA), prohibits a private employer from discriminating against a "qualified individual with a disability *on the basis of* that disability."[70] 42 U.S.C. § 12112(a) (emphasis added).

The Fifth Circuit's ADA causation standard has, as relevant here, two parts: discrimination (1) "'need not be the sole reason for the adverse employment decision,'" but (2) "'must actually play a role in the employer's decisionmaking process and have a determinative influence on the outcome.'" *Pinkerton*, 529 F.3d at 519 (brackets omitted) (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503–04 (5th Cir. 2002)).  As set out in the margin, this standard has its roots in *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989 (5th Cir. 1996) (en banc), and *Hazen Paper Company v. Biggins*, 507 U.S. 604 (1993)—which are ADEA cases.[71]  In

---

[69] Although § 501 of the RA, by its literal wording, merely requires federal agencies to "submit . . . an affirmative action program plan for the hiring, placement, and advancement of individuals with disabilities," 29 U.S.C. § 791(b), the Fifth Circuit has held that § 501 provides for a private cause of action against such an agency for disability employment discrimination, *Burns*, 456 F. Supp. 3d at 823 & n.40 (citing *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 304 (5th Cir. Unit A Nov. 1981), and *de la Torres v. Bolger*, 781 F.2d 1134, 1135 n.1 (5th Cir. 1986)); *see also Lane v. Pena*, 518 U.S. 187, 193 (1996) ("[Section] 501 of the Rehabilitation Act, 29 U.S.C. § 791, . . . prohibits discrimination on the basis of disability in employment decisions by the Federal Government.").

[70] As originally enacted, the ADA prohibited discrimination "because of the disability of such individual."  Pub. L. No. 101–336, § 102 (1990).  The ADAAA changed this language to its present form, prohibiting discrimination "on the basis of disability."  Pub. L. No. 110–325 § 5 (2008).

[71] *See Pinkerton*, 529 F.3d at 519, quoting *Soledad*, 304 F.3d at 503–04 (involving claim under § 504 of the RA)—in turn, quoting *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 835 (5th Cir. 2000) (involving Title VII and ADA claims)—in turn, quoting *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 253

*Hazen Paper*, the Supreme Court stated, "[w]hatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome" (hereinafter, the *Hazen Paper* standard). *Hazen Paper*, 507 U.S. at 610. The second part of the Fifth Circuit's ADA standard tracks the *Hazen Paper* standard. The first part, on the other hand, was introduced together with the *Hazen Paper* standard in *Rhodes*, where the Fifth Circuit sitting en banc stated: the protected trait (there, age) "*need not be the sole reason for the adverse employment decision*; however, 'a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in . . . [the employer's decisionmaking process] and had a determinative influence on the outcome'" (hereinafter, the *Rhodes-Hazen Paper* standard). *Rhodes*, 75 F.3d at 994 (alternations and ellipses in original) (quoting *Hazen Paper*, 507 U.S. at 610).

Since adopting the *Rhodes-Hazen Paper* standard in its ADA jurisprudence, the Fifth Circuit has held that the ADA does not require proof of "sole causation" and the ADA's causation standard permits "a motivating factor" or mixed-motives theory. The *Rhodes-Hazen Paper* standard made its first appearance in the ADA jurisprudence by the way of *Ahrens*, a case involving Title VII and ADA claims. There, the Fifth Circuit cited this standard for the proposition that the plaintiff was not required to prove that discrimination was the sole cause of her discharge. *Ahrens*, 205 F.3d at 835 (quoting *Woodhouse*, 92 F.3d at 253 (an ADEA case)).

Next, in *Soledad*, a case involving a claim under § 504 of the RA, the Fifth Circuit expressly adopted the *Rhodes-Hazen Paper* standard as the ADA causation standard, *Soledad*,

---

(5th Cir. 1996) (involving ADEA claim)—in turn, citing *Rhodes*, 75 F.3d 989, 994 (involving ADEA claim)—in turn, quoting *Hazen Paper*, 507 U.S. at 610 (involving ADEA claim).

304 F.3d at 503–04 (quoting *Ahrens*, 205 F.3d at 835),[72] and equated the newly-minted ADA

standard with "a motivating factor" standard, *id.*, 304 F.3d at 503 (noting that the jury charge

provided "THIRD: His disability was a *motivating factor* in Defendant's treatment of the

plaintiff." (emphasis in original)); *id.* at 504 (stating "[i]t is clear that the jury charge stated

above was a proper ADA charge"). The *Soledad* panel moreover distinguished the ADA

standard from that for claims under § 504 of the RA: the latter requires a "solely because of"

form of causation, a "higher level of causation," because § 504's express language requires that

discrimination be "solely by reason of her or his disability." *Id.* at 504–05; *see also* 29 U.S.C. §

794(a) (Section 504 provision).

     Later, in *Pinkerton*, a case most relevant to the case subjudice because it turned on proper

causation standard for claims under § 501 of the RA, a panel of the Fifth Circuit held that the

stringent causation standard of § 504 of the RA is inapplicable to claims under § 501 of the RA

because unlike § 504, § 501 "does not contain language overriding the ADA standards" that is

incorporated by 29 U.S.C. § 791(f). *Pinkerton*, 529 F.3d at 516–17. The panel went to further

hold that the causation standards under § 501 of the RA and ADA are equivalent, *id.* at 516; and

the ADA standard announced in *Soledad* governs § 501 claims, *id.* at 519 (quoting *Soledad*, 304

F.3d at 503–04). In reaching these holdings, the panel stated that "[u]nder a plain reading of the

statute, . . . the ADA does not require 'sole causation,'" and further that the ADA standard "is a

'motivating factor' test." *Id.* at 519.

     More recently, even post-*Gross*, the Fifth Circuit continues to refer to its ADA standard

as a "motivating factor" test, *e.g.*, *Hoffman v. Baylor Health Care Sys.*, 597 F. App'x 231, 235

n.12 (5th Cir. 2015), and has interpreted it as authorizing the mixed-motives theory to establish

---

[72] At the time, the ADA, like the ADEA, used the "because of" language. *Compare* 42 U.S.C. § 12112(a) (2000) ("because of the disability of such individual"), *with* 29 U.S.C. § 623(a) (1998) ("because of such individual's age").

an employer's liability for disability discrimination, *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 702 (5th Cir. 2014).[73]  In *LHC*, the panel analyzed the facts of that case under the mixed-motives theory on a summary judgment posture.  *Id.* at 702–03.  As the panel's analysis suggests, although the Fifth Circuit's ADA standard permits the mixed-motives theory, it does not require it.  *See id.* at 702 (applying "mixed-motives" as an alternative).

Enter *Gross* and *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013).  In *Gross*, the Supreme Court held that the ADEA's statutory language "because of such individual's age," 29 U.S.C. § 623(a), does not authorize "a motivating factor" or "mixed-motives" theory.  *Gross*, 557 U.S. at 174–75.  It concluded that the ordinary meaning of "because of" is "'but-for' cause," meaning that "age was the 'reason' that the employer decided to act."  *Id.* at 176.  As the Fifth Circuit has observed, *see Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 351 (5th Cir. 2014), in describing what it means to be a 'but-for' cause, the *Gross* court cited the *Hazen Paper* standard—which, as discussed *supra*, is the second part of the Fifth Circuit's ADA standard.  Specifically, the Supreme Court echoed, "the claim 'cannot succeed unless the employee's protected trait actually played a role in [the employer's decisionmaking] process *and had a determinative influence on the outcome*.'" *Gross*, 557 U.S. at 176 (italicized emphasis and alterations supplied by the *Gross* court) (quoting *Hazen Paper*, 507 U.S. at 610)).  As evinced by the supplied emphasis, for the *Gross* court, the "determinative influence  . . ." clause of the *Hazen Paper* standard was of critical significance.

---

[73] Just this past month, the Fifth Circuit, in an unpublished decision, has stated, an ADA "plaintiff must . . . show [the defendant's business] reasons were pretextual, by showing the proffered explanation is 'false or unworthy of credence,' or that his disability was still a 'motivating factor in the decision' to fire him in spite of any other proffered reasons." *Jones v. Lubbock Cty. Hosp. Dist.*, No. 19-11364, --- F. App'x ---, 2020 WL 6787549, at *3 (5th Cir. Nov. 18, 2020) (quoting *LHC Grp.*, 773 F.3d at 702)).

Then, in *Nassar*, the Supreme Court held that "because" as used in Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a),[74] like the ADEA's "because of" language, requires proof according to traditional principles of "but-for" standard, and not the lessened "motivating factor" standard. *Nassar*, 570 U.S. at 348, 351–52, 360. In reaching that holding, the *Nassar* court cited the *Hazen Paper* standard as an example of the traditional "causation in fact" standard in tort law, *id.* at 346 (citing *Hazen Paper*, 507 U.S. at 610), and pointed out that the tort standard, in turn, requires proof that "the harm would not have occurred in the absence of— that is, but for—the defendant's conduct," *id.* at 346–47.

It thus appears that *Gross* and *Nassar* cast doubts on the "motivating factor" aspect of the Fifth Circuit's ADA causation standard. *See Clark v. Boyd Tunica, Inc.*, 665 F. App'x 367, 371 n.4 (5th Cir. 2016) (observing that the *LHC* panel did not "address[ ] *Gross*" and declining to resolve whether the mixed-motives alternative survived *Gross* (citing *LHC Grp.*, 773 F.3d at 702)). That said, however, nothing in *Gross* (or *Nassar*) disturbs the Fifth Circuit's other holdings that unlike § 504 of the RA, § 501 of the RA and the ADA do not require "sole causation." *Pinkerton*, 529 F.3d at 519, *ante*; *Soledad*, 304 F.3d at 504–05, *ante*. Indeed, in the ADEA context, the Fifth Circuit has stated that even under *Gross*, "'but-for cause' does not mean 'sole cause.'" *Leal v. McHugh*, 731 F.3d 405, 415 (5th Cir. 2013) (ADEA case); *accord Arthur v. Pet Dairy*, 593 F. App'x 211, 220 (4th Cir. 2015) ("But, pursuant to *Gross*, for an event to be the "but-for cause," it need not be the sole cause of the adverse employment action."); *see also Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010) (ADEA case) ("*Gross* does not disturb longstanding Tenth Circuit precedent by placing a heightened evidentiary

---

[74] The provision makes it unlawful "for an employer to discriminate against any of his employees . . . *because* he has opposed any practice made an unlawful employment practice by this subchapter, or *because* he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added).

requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action.").

With that background, the Court returns to the Secretary's arguments.  In light of *Leal*, the Secretary's pre-verdict argument that the second sentence of the causation-element of the Court's charge (*i.e.*, that disability need not be the only reason) implies a "motivating factor" standard and is inconsistent with the first sentence (*i.e.*, "because of his disability") is unavailing. *See Leal*, 731 F.3d at 415, *ante*; *see also Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc) ("A law establishing liability against employers who discriminate 'because of' an employee's disability does not require the employee to show that the disability was the 'sole' cause of the adverse employment action." (addressing ADA standard in light of *Gross*)); *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 236 n.5 (4th Cir. 2016) ("While the district court at one point misspoke and stated that disability had to be the sole cause of Gentry's termination, the court corrected itself by providing oral and written instructions that disability need not be the 'only or sole cause' of Gentry's termination.").  The second sentence plainly embodies the Fifth Circuit's long-standing holdings that § 501 of the RA and the ADA do not require "sole causation."

The Secretary next broadly argues that the Court should have charged the jury with the "but for" standard of causation.  Def.'s Suppl. Mot. at 5–6.  As explained below, this argument is moot or was waived.  The Fifth Circuit's pattern jury instructions provide three options for ADA's causation element:[75] (1) a basic charge that tracks the ADA's "because of" language;[76]

---

[75] The Committee on the pattern jury instructions explains, "[t]he causation standard in ADA cases may be in flux" and "the Fifth Circuit has not yet analyzed the ADA in light of *Gross*, and its post-*Gross* decisions fail to provide a clear answer."  Fifth Cir. PJI at 178.  The Committee, therefore, "has taken no position on this issue and has instead provided [the] options."  *Id.* at 180 n.9.

[76] The charge with the "because-of" language provides:

(2) an alternative charge with the "but for" language, which is recommended "[i]f the law develops to make the use of but-for causation clear";[77] and (3) the mixed-motives charge with "motivating factor" language, by the way of cross-references to Title VII's "§ 2(m)" mixed-motives charge,[78] which is recommended "[i]f a court wishes to instruct on mixed motives." Fifth Cir. PJI at 179, 180 & n.4, 182 n.9.  Each of the recommended charges includes the second sentence of the Court's charge that the Secretary challenged at the charge conference, but they differ only by the causation language in the first sentence: "because of," "but for" and "motivated by."  *Id.*

---

6. Defendant [name] [specify adverse employment action] Plaintiff [name] <u>because of</u> [his/her] [specify alleged disability]. *Plaintiff [name] does not have to prove that [his/her] [specify alleged disability] was the only reason Defendant [name] [specify adverse employment action].*

Fifth Cir. PJI at 182 (footnote omitted) (emphasis added).

[77] The charge with the "but-for" language provides:

"6. Defendant [name] would not have [specify adverse employment action other than failure to accommodate] [him/her] <u>but for</u> Plaintiff [name]'s [specify alleged disability]. *It is not necessary that Plaintiff [name]'s disability be the only reason for Defendant [name]'s decision to [specify adverse employment action].*  But you must find that that Defendant would not have made the decision in the absence of the Plaintiff [name]'s [specify alleged disability]."

*Id.* at 182 n.9 (emphasis added).

[78] The charge for a claim under 42 U.S.C. § 2000e-2(m) provides:

Defendant [name]'s [specify adverse employment action] of Plaintiff [name] was <u>motivated by</u> [his/her] [protected trait].

*Plaintiff [name] does not have to prove that unlawful discrimination was the only reason Defendant [name] [specify adverse employment action] [him/her].*

*Id.* at 130–31 (emphasis added); *see also id.* at 132 (jury question for § 2(m) claim) ("Has Plaintiff [name] proved that . . . [his/her] [protected trait] was a motivating factor in Defendant [name]'s decision to [specify adverse employment action] [him/her]?").

Before trial, Burns requested the mixed-motives charge, *see* Pl.'s Am. Proposed Charge at 23 ("Defendant Nielsen's removal of Plaintiff Burns from climbing duties was *motivated by* his disability." (causation element) (emphasis added)), ECF No. 65; *id.* at 39 ("Has Plaintiff Burns proved that his disability was *a motivating factor* in Defendant Nielsen's decision to remove him from climbing duties" (jury question) (emphasis added))—to which the Secretary objected, Def.'s Ltr. Br., ECF No. 96.  At the charge conference, Burns abandoned its prior request for the mixed-motives charge in favor of the "because of" charge—that the Court selected.[79]  Consequently, to the extent that the Secretary argues that the Court should have given the "but for" charge in lieu of the mixed-motives charge, that argument is moot.  *See* Def.'s Suppl. Mot. at 2 ("The jury should not have been instructed with a mixed motive jury chart [*sic*].").

However, to the extent that the Secretary argues that the Court should have instructed the jury with the "but for" charge, in lieu of the "because of" charge, the Secretary did not so request at trial.  In his proposed jury instructions submitted before trial, the Secretary copied verbatim the pattern instructions—setting forth the "because of" charge in the body of the submission and listing in a footnote, the alternative "but for" charge (just as they are provided in the pattern instructions).[80]  *See* Def.'s Am. Proposed Gen. & Special Jury Instrs. at 33 & n.31, ECF No. 61-4.  Critically, at the charge conference, the Secretary did not request the Court to instruct the jury

---

[79] Liab. Trial Tr., Vol. 7, at 63:9–12 (statement of plaintiff's counsel) ("Obviously, we were arguing for something more, but . . . the language that's being used currently is the correct reflection of . . . the A.D.A.").

[80] That suggested to the Court that at least as between the "because of" and "but for" charges, the Secretary had no objection to the former.  *Cf.* Def.'s Ltr. Br. (expressly objecting to mixed-motives charge proposed by Burns pretrial), ECF No. 96; *cf. also, Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 339 n.4 (5th Cir. 2016) ("Arguments subordinated in a footnote are insufficiently addressed in the body of the brief, and thus waived." (internal quotation marks and citation omitted)).

with the "but for" language in lieu of the "because of" language; nor did he object to the latter language, *i.e.*, the first sentence of the Court's charge ("The Agency removed Plaintiff Joseph Burns from tower climbing duties because of his disability"). Consequently, the Secretary waived this argument. *See* Fed. R. Civ. P. 51(d)(1)(A)–(B) ("A party may assign as error: (A) an error in an instruction actually given, if that party properly objected; or (B) a failure to give an instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected.").

In sum, the Court denies the Secretary's motion for judgment as a matter of law, or in the alternative, motion for a new trial on the ground that its jury charge on the causation element was improper or incorrect. *See RBIII, L.P. v. City of San Antonio*, 713 F.3d 840, 847 (5th Cir. 2013) (In assessing a challenge to the jury charge, courts "ask whether the jury charge properly stated the applicable law and, if not, whether the challenged instruction affected the outcome of the case." (internal quotes omitted)).

## B. Liability Verdict on Disability Discrimination Claims

The Secretary argues that there is insufficient evidence to support the jury's finding of discrimination based on disability. Def.'s Suppl. Mot. at 6. Burns alleged that Defendant discriminated against him on the basis of his disability or being regarded as disabled when Yrrobali removed him from climbing duties.[81] As mentioned *supra*, he brought this action pursuant to § 501 of the RA, 29 U.S.C. § 791, and a claim for disability discrimination under § 501 is governed by the standards of the ADA, 42 U.S.C. § 12111 *et seq*. The ADA, as amended

---

[81] *See* Pl.'s Suppl. Resp. at 6 ("Burns alleged and presented evidence that Defendant discriminated against him on the basis of his disability or being regarded as disabled when Yrrobali removed him from climbing duties. This section is limited to argument regarding the removal from climbing duties. While the [improper medical inquiry] is a disability discrimination issue, it will be discussed in Section VI, below.").

by the ADAAA, provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

As with other anti-discrimination statutes, the plaintiff bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against him because of his disability, *see Laxton*, 333 F.3d at 578—that is, his disability "actually play[ed] a role in" and "ha[d] a determinative influence on" the Agency's decisionmaking process, *Pinkerton*, 529 F.3d at 519.  At the summary judgment stage, under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), framework, Burns was required to create a genuine dispute as to each element of his *prima facie* case of discrimination and whether the Agency's proffered reason for its adverse employment decision was pretextual.  *Burns*, 456 F. Supp. 3d at 824.[82]  However, when, as here, a case has been fully tried on the merits, the *McDonnell Douglas* framework "becomes moot."  *Adams v. Groesbeck Indep. Sch. Dist.*, 475 F.3d 688, 691 (5th Cir. 2007).[83]  Instead, courts "inquire whether the record contains sufficient

---

[82] "To establish a prima facie discrimination claim under the ADA and by extension, under § 501 of the Rehabilitation Act, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability, *i.e.*, there was a 'causal nexus,' *i.e.*, 'causal connection,' between the adverse employment action and his disability." *Burns*, 456 F. Supp. 3d at 824 (citing *LHC Grp.*, 773 F.3d at 695, 697, 699)).

[83] *See also, e.g.*, *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 476 (5th Cir. 2005) ("We need not parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext.  When a case has been fully tried on the merits, the adequacy of a party's showing at any particular stage of the *McDonnell Douglas* ritual is unimportant." (internal quotes and citation omitted)); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004) ("When there has been a trial on the merits, the evaluation process is streamlined and we proceed directly to the ultimate question of whether the plaintiff presented enough evidence for a jury to find that discrimination occurred." (internal quotes and citation omitted)); *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011) ("But because this case has been fully tried on the merits, we need not address the sufficiency of Black's prima facie case, and may

evidence to support the jury's finding of [disability] discrimination." *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013).

### 1. *Actual Disability*

The Secretary argues that Burns failed to establish that he was disabled.  Def.'s Suppl. Mot. at 12–13.  As relevant here, the ADA defines actual "disability," as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(1)(A).  Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).  The inquiry is "whether [Burns's] impairment substantially limits his ability 'to perform a major life activity as compared to most people in the general population.'" *Cannon v. Jacobs Field Servs. N. Am., Inc*., 813 F.3d 586, 591 (5th Cir. 2016) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).

Burns testified that he suffers from migraines since 1998, when a neurologist diagnosed him with migraines.  Burns Tr. at 13:13–14, 19:5.  In his letter dated April 26, 2016, Dr. Rampy stated that Burns has chronic migraine headaches.  Pl.'s Ex. 15, ECF No. 99-15.  During the one-year period before April 2016, Burns made ten requests for sick leave because of migraines, headaches, and doctor's visits.  Pl.'s Ex. 10, ECF No. 99-10; Burns Tr. at 24:23–25:4.  Burns testified that prior to April 2016, he had migraine headaches ten times a year, and that a lot of his migraine episodes happen in evening or night at home.  Burns Tr. at 16:12–16.  He testified that a migraine episode can last up to six hours, Burns Tr. at 21:11–15, and his migraines cause

---

instead proceed directly to the ultimate question of whether Black has produced sufficient evidence for a jury to find that discrimination has occurred." (alterations, internal quotes, and citation omitted)).

throbbing pain in the left side of his head, nausea, dizziness, lightheadedness, sweating, vomiting, and sensitivity to light, *id.* at 16:12–21:15, 61:8–12.  He further testified that during a migraine episode, he has difficulties with concentrating and sleeping, and cannot climb, walk, drive, or work.  Burns Tr. at 18:16–19:20; *see also id.* at 19:9–15 ("I can't do anything."). Drawing all inferences in favor of the verdict, the record thus provides a sufficient basis for a reasonable jury to find that Burns migraines substantially affected one or more of major life activities, and therefore, was a disability.

### 2. Regarded-As Disability

Relying on a pre-ADAAA case, the Secretary appears to argue that the Agency did not regard Burns "as having a substantial limitation on his ability to work in general."  Def.'s Suppl. Mot. at 12 (citing *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 807 & n.10 (5th Cir. 1997)). That is not the correct standard under the ADA, as amended by the ADAAA enacted in 2008. "The ADA now covers not just someone who is disabled but also those subjected to discrimination because they are 'regarded as having . . . an actual or perceived physical or mental impairment *whether or not* the impairment limits or is perceived to limit a major life activity,'" *Cannon*, 813 F.3d at 591 (quoting 42 U.S.C. § 12102(1)(C), (3)(A)).  As amended, the ADA overrules "prior authority requiring a plaintiff to show that the employer regarded him or her as being substantially limited in a major life activity."  *Id.* at 591–92 (internal quotes and citation omitted).  Burns was therefore required to show only that "officials at [the Agency] perceived his [chronic migraine condition] to be an impairment."  *Id.* at 592.

The record shows that as early as when Yrrobali worked with Burns as a colleague, Yrrobali knew about Burns's migraine condition. Yrrobali Tr., vol. 1, at 37:6–8.  Yrrobali's March 14, 2016 email to Benn (on which, as discussed in Part III(B)(4), *post*, Benn relied in

recommending Yrrobali to request Burns to provide medical documentation and to restrict his climbing) shows that Yrrobali believed that Burns's condition degraded his capacity to work, his memory, and mental judgment.  Pl.'s Ex. 15.  Therein, he stated that on multiple occasions, Burns left or missed work due to his migraine condition, took medications for that condition, and Burns suffers side-effects from these medications.  *Id.*  Thus, the jury had more than sufficient evidence to find that the Agency perceived Burns's chronic migraine condition to be an impairment and therefore regarded him as disabled.  *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015) (holding that employer regarded the plaintiff as disabled when the supporting documentation for plaintiff's termination specifically tied "complaints about [plaintiff's] conduct to her asserted medical needs," including emails that "extensively discuss[ed] [the plaintiff's] health condition and reference her need 'to sit down for a bit,' 'chest pains,' and trouble breathing").

### 3.  *Adverse Employment Action*

The Secretary argues that Burns failed to prove that he was subjected to an adverse employment action.  Def.'s Suppl. Mot. at 20.  According to the Secretary Burns testified that the adverse action he suffered from the climbing restriction was the lost opportunity to earn hazard pay.  *Id.*  He adds that hazard pay is conditional upon him performing hazardous duties, including tower climbing, and his "regular benefits" were not reduced.  *Id.*  Consequently, the Secretary argues, without citing any authority, that Burns cannot show adverse action for the loss of "speculative potential" hazard wages he could have earned but for the restriction.  *Id.*

The Secretary advances this argument for the first time on this motion.  Before trial, in his proposed jury instructions, Burns specified the conduct that constitutes the adverse employment action: "Defendant Nielsen removed Plaintiff Burns from climbing duties."  Pl.'s

Am. Proposed Charge at 23; *cf.* Fifth Cir. PJI at 181 (§11.8B) ("4. Defendant [name] [specify adverse employment action] Plaintiff [name]."). The Secretary did not file any objection to that charge. *See* Def.'s Objs. to Pl.'s Am. Proposed Charge, ECF No. 79. The Court adopted Burns's proposed charge, but the Secretary did not object thereto at the charge conference. The jury therefore was not asked to specifically determine whether removal from climbing duties constituted an adverse employment.[84] The Secretary has waived this argument. *See* Fed. R. Civ. P. 51(d)(1)(A)–(B).

Moreover, the record counters the Secretary's characterization of the hazard pay for climbing towers as "speculative" or "potential." FTOs, such as Burns, receive "hazard pay" for climbing towers at an additional 25% of their daily base pay, and for Burns, the pay was $80-85 per climb. Pl.'s Ex. 11; Joint Ex. 1 at ¶ 8; Yrrobali Tr., vol. 1, at 10:10–11:12; Burns Tr. 29:18–30:1. Yrrobali testified that Burns, a secondary climber, climbed towers sometimes once a week and sometimes once in two weeks. Yrrobali Tr., vol. 1, at 10:10–11:12. In his March 14, 2016 email to Benn, Yrrobali anticipated that the climbing restriction would affect Burns's pay for climbing towers, Pl.'s Ex. 11; Yrrobali Tr., vol. 1, at 62:9–63:1, 119:23–120:23, and at trial, Yrrobali testified that during the period when Burns was restricted from climbing towers, he lost hazard pay, Yrrobali Tr., vol. 1, 170:19–171:2. Further, the parties stipulated that Burns lost hazard pay in the amount of $3,068.56 for the period between April 6, 2016 and May 3, 2017. Joint Ex. 1 at ¶ 26. Burns testified that because of the climbing restriction, he lost hazard pay during the period between April 6, 2016 (when Yrrobali imposed the restriction) and September

---

[84] In Title VII context, the Fifth Circuit has stated that "an adverse employment action consists of ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (emphasis, internal quotes, and citation omitted); *see also McKay v. Johanns*, 265 F. App'x 267, 269 (5th Cir. 2008) (applying the *Pegram* definition of "adverse employment action" to discrimination claims under the ADA and by extension, the RA).

14, 2016 (when Yrrobali lifted the restriction) and missed the annual climbing recertification

class held during that period, which led to loss of additional hazard pay until May 3, 2017 (when

he was recertified again).  Burns Tr. at 10:23–12:12, 37:12–23, 76:9–14; see also Yrrobali Tr.,

vol. 1, at 13:11–14:9.

### 4.  Discrimination Because of Disability

The Secretary argues that the jury's finding of discrimination is not supported by

sufficient evidence.  Def.'s Suppl. Mot. at 6.  At trial, "the jury is called upon to decide whether

[the plaintiff] has proved intentional discrimination."  *West v. Nabors Drilling USA, Inc*., 330

F.3d 379, 384 (5th Cir. 2003).  To meet that burden, and therefore to survive a motion such as

this one, "the plaintiff must produce substantial evidence indicating that the proffered legitimate

nondiscriminatory reason is a pretext for discrimination."  *Laxton*., 333 F.3d at 578.[85]  "Evidence

is substantial if it is of such quality and weight that reasonable and fair-minded men or women in

the exercise of impartial judgment might reach different conclusions."  *Id.* at 579 (brackets,

internal quotes, and citation omitted).

"Evidence of pretext 'may take a variety of forms.'"  *Robinson v. Jackson State Univ*.,

714 F. App'x 354, 362 (5th Cir. 2017) (quoting *Patterson v. McLean Credit Union*, 491 U.S.

164, 187 (1989)).  The plaintiff "may establish pretext by showing . . . that [his] employer's

explanation is unworthy of credence."  *Wallace v. Methodist Hosp. Sys*., 271 F.3d 212, 220 (5th

Cir. 2001) (alterations, internal quotes, and citation omitted)).  The plaintiff may also use a

decisionmaker's "statement exhibiting discriminatory animus . . . to demonstrate pretext," or use

---

[85] *See also Laxton*, 333 F.3d at 579 ("[T]o survive Gap's motion for judgment as a matter of law, Laxton must produce evidence permitting the jury to disbelieve that Gap's proffered reason was its true motivation."); *Ellerbrook v. City of Lubbock, Tex*., 465 F. App'x 324, 333 (5th Cir. 2012) ("[W]hether Martha established pretext is important to our determination of whether the evidence supports the jury's verdict that the City unlawfully retaliated against Martha.").

it "as additional evidence of discrimination." *Laxton*, 333 F.3d at 583.[86]  When the employer

takes the adverse employment action based on the complaints of another employee, the inquiry is

"whether the employer reasonably believed the employee's allegation[s] and acted on it in good

faith," or to the contrary, "relied on them in a bad faith pretext to discriminate against [the

plaintiff-employee] on the basis of his [disability]."  *Waggoner v. City of Garland, Tex.*, 987

F.2d 1160, 1165–66 (5th Cir. 1993) (italicized emphasis omitted).[87]

The Secretary takes the position that in requesting medical documentation from Burns's

physicians[88] and restricting Burns from climbing towers pending the receipt of the

documentation, the Agency was addressing a legitimate safety concern brought to Yrrobali's

attention by Apodaca about Burns's climbing towers.  *Id.* at 7, 15, 19.[89]  He argues that Burns

failed to show that the Agency did not have a legitimate safety concern in restricting him from

climbing towers.  *Id.* at 16.  He further argues that Burns failed to adduce any evidence to

suggest that Apodaca provided Yrrobali with wrong or bad information, or that Yrrobali was not

relying in good faith on Apodaca's information or acted with discriminatory intent.  *Id.* at 14–16.

Burns responds that he presented substantial evidence that allowed the jury to find

pretext.  Pl.'s Suppl. Resp. at 9, 15.  Specifically, he points out, *inter alia*, that evidence at trial

---

[86] *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination.").

[87] *See also Long v. Eastfield Coll.*, 88 F.3d 300, 306–07 (5th Cir. 1996) (discussing two distinct lines of cases, one involving complaints and recommendations from ordinary employees and the other involving the same from supervisory employees).

[88] According to Burns, for purposes of the general discrimination claims, the adverse employment action was the climbing restriction.  *See* Pl.'s Suppl. Resp. at 6.  As reflected in the parties' brief, however, the climbing restriction was inextricably intertwined with the Agency's request for medical information.

[89] *See also* Liab. Trial Tr., vol. 3, at 15:20–22 (defense opening argument), ECF No. 148.

(1) called into question whether there ever was any safety concern about Burns; (2) showed that Yrrobali's March 14, 2016 email Yrrobali's to Benn contained statements revealing his subjective fears about Burns's migraines and additionally, contained false information;[90] and (3) further showed Burns had no report of climbing accidents but the Agency did not attempt to verify the safety concern Apodaca relayed. *Id.* at 9–15. He argues that this evidence also supports that Yrrobali did not act in good faith. *Id.* at 17.

Below, the Court separately addresses the evidence relating to the roles Apodaca and Yrrobali each played in the Agency's decision to restrict Burns's tower climbing duties.

### (a) Evidence Regarding Apodaca's Role

Apodaca testified that Molinar told him that "the RVSS people had a concern about Mr. Burns'[s] climbing while having migraines," Apodaca Tr. at 10:11–13; *see also id.* at 9:13–10:19, 29:14–21, and he then "in good faith" relayed that information to Yrrobali, *id.* at 30:4–11, 45:2–4. However, Molinar testified that she never told Apodaca about any report of safety concern regarding Burns. Liab. Trial Tr., vol. 4, at 277:21–278:19.[91] She also testified that no

---

[90] In their closing arguments during the liability phase of the trial, counsel for Burns argued that "[t]hat March e-mail is exaggeration or fabrication, one of those two" and that "[t]he medical document demand provided to Mr. Burns was wholly based on a March 14th e-mail . . . with personal fears and subjective motivations of Mr. Yrrobali."

[91] The following colloquy from Molinar's deposition testimony was presented to the jury:

Q. [PLAINTIFF'S COUNSEL] And I'll tell you, Mr. -- you -- you can read in the Exhibit 7 that Mr. Yrrobali is saying that there are these concerns that are being raised by Joe Burns'[s] fellow co-workers.

A. [MOLINAR] Yeah.

Q. And through the testimony, it's come out that apparently you may have been the one that have taken – had taken those initial complaints and told Mr. Apodaca or Mr. Yrrobali about that. You don't remember that, right?

A. I have no recollection of that. I'm going to tell you for sure, I do not. You know, you -- you know, the guys don't usually confide, you know, in me about each other, you

one, including the RVSS members, reported to her any safety concern about Burns. *Id.* at 273:23–276:10; *see also id.* at 276:9–10 ("To the best of my recollection, I don't think anybody ever had a concern about that."); *id.* at 279:11–12 ("I never heard any complaints about Joe [Burns]."). The RVSS team members testified that none of them said anything about Burns's alleged safety issue to Molinar or Apodaca. Nunez Tr. at 15:18–16:1, ECF No. 138; Cervantes Tr. at 11:5–19, ECF No. 136; Stevens Tr. at 7:7–15, 12:1–6, ECF No. 135.

Furthermore, although Apodaca testified the he saw a "safety concern" when Molinar conveyed that information to him, and therefore, felt the need to relay it to Yrrobali, Apodaca Tr. at 15:17–16:11, 18:18–24, counsel for Burns, in an attempt to impeach that testimony, offered Apodaca's prior deposition to show that Apodaca previously testified to the contrary, *id.* 16:12–19:19; *see also id.* at 35:7–36:2 (on cross by defense), 41:21-42:2 (same).

From this evidence, the jury could have reasonably drawn a number of inferences adverse to the Agency, including that Apodaca fabricated the report of safety concern regarding Burns and therefore, lacked good faith. *Cf. Waggoner*, 987 F.2d at 1165–66 (finding no discrimination where ultimate decisionmaker, a director, discharged plaintiff based on a co-worker's allegations of sexual harassment against plaintiff, which she reported to a supervisor, stating that the plaintiff failed to produce evidence that the director and supervisor "fabricated them for the purpose of discriminating against" him).

---

know. They confide in me for a lot of stuff, believe me, but complaints about co-workers, that just was not a common occurrence and I don't recall any complaints about Joe [Burns].

Liab. Trial Tr., vol. 4, at 277:21–278:19. The Secretary acknowledges that Molinar's testimony contradicts Apodaca's: "[a]t trial, there was conflicting testimony as to whether Barbara Molinar . . . relayed to Apodaca safety concerns regarding Plaintiff that were purportedly raised by FTOs relating to Plaintiff climbing towers while having migraines." Def. Suppl. Mot. at 13 (citing Apodaca Tr. 9:13-18, 10:2-13; J. Ex. at ¶ 18).

## (b) Evidence Regarding Yrrobali's Role

For two reasons, Yrrobali's statements in the March 14, 2016 email are strongly probative of the Agency's discriminatory animus.  First, those statements formed the basis of the Agency's actions.  Specifically, relying on Yrrobali's statements, and no other, Benn twice recommended that Yrrobali issue letters seeking medical documentation from Burns and restrict Burns from climbing duties.  Benn Tr. at 10:25–11:24, 43:14–19, 44:4–7, 44:24–45:7; Yrrobali Tr., vol. 1, at 84:16–18, 127:24–25; Pl.'s Exs. 12, 13, 23.  Thomas, the Agency's MFB nurse who reviewed Dr. Rampy's letter for sufficiency, relied on Yrrobali's email when she made the same recommendations as did Benn for purposes of Yrrobali's second letter to Burns.  Pl.'s Ex. 17 (Benn's email providing Thomas with a copy of Yrrobali's email); Pl.'s Ex. 20 (Thomas's response); Benn Tr. 19:1–21.  Fernandez also relied on Yrrobali's email.  Fernandez Tr. at 10:17–11:7, 94:17–24.

Second, Yrrobali, as Burns's direct supervisor, was the principal decisionmaker of the complained-of actions.  *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41–42 (5th Cir.1996) ("To be probative, allegedly discriminatory statements must be made by the relevant decisionmaker.").[92]  He executed and served the April 6 and August 18, 2016 letters on Burns.  Although Benn drafted the letters for Yrrobali, Benn Tr. at 11:11–24, she testified that she did so in an advisory role as a human resource personnel, *id.* at 12:4–25, and that Yrrobali and Fernandez were the ultimate decisionmakers, *id.* at 24:12–14.  Fernandez echoed Benn's testimony.  Fernandez Tr. at 13:24–14:9.  He further testified that he did not "micromanage" Yrrobali's and Benn's activities on the two letters, and further that, although he was copied on

---

[92] *See also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) ("Typically, the person with authority over the employment decision is the one who executes the action against the employee.").

Yrrobali's March 14, 2016 email to Benn, he was not involved with the content of the email.  *Id.* at 60:11–25, 71:13–15.

The jury could have reasonably found that Yrrobali's statements in the March 14, 2016 email suggested his discriminatory motive.  Specifically, the email contained not only what Apodaca relayed to him,[93] but also Yrrobali's subjective views and opinions about Burns's migraines and the unspecified medications Burns took.  He wrote:

> We met on Friday . . . and briefly discussed an issue involving a medical situation on one of my employees, FTO Joseph Burns and the impact on safety it causes. The issue was brought to my attention from some of my FTO . . . employees and FTO Joseph Burns' previous supervisor. . . .
>
> My other FTOs (his coworkers) have expressed their feelings about the safety of FTO Joseph Burns working with them on the RVSS camera towers.  <u>This is due to his condition and medication he has been placed on that might be affecting his capacity to work being degraded, due to side effects of the medications that have been noticed and Mr. Burns demeanor differences with his memory and mental judgement during decisions while on the towers (long delay).</u>

Pl.'s Ex. 11 (underline supplied).  Apodaca testified that the only statement in the email that could be attributed to him as a source was that the RVSS crew had concerns with Burns's climbing while having migraines.  Apodaca Tr. at 23:15-28:20, 43:7–10.  Each of the three RVSS crew members testified that nothing in the email came from them.  *E.g.*, Stevens Tr. at 10:10-11:14, 12:1–17, 13:1–5; Cervantes Tr. at 11:20–13:21; Nunez Tr. at 14:10–21.  When questioned about these statements, Yrrobali testified that some of them were based on his "assumptions," Yrrobali Tr., vol. 2, at 38:6–20, some were based on his "personal belief," *id.* at 70:8–71:5, and yet others reflected mere "possibilities," Yrrobali Tr., vol. 1, at 89:24–90:6.

---

[93] *See also* Yrrobali Tr., vol. 1, at 54:7–22; 56:13–16; *id.* at 45:12–14 ("Mr. Apodaca informed me that it had been brought to his attention there was a safety concern from some of his fellow employees."); Yrrobali Tr., vol. 2, at 166:23–167:8 (testifying that Apodaca reported to him about Burns's "tower climbing along with medication and/or experiencing migraines").

The jury could have reasonably inferred that these statements reflect Yrrobali's

subjective fears and prejudice about Burns's migraine condition, and therefore his discriminatory

motive.  *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117–18 (10th Cir. 2007) (The trier

of fact can infer discriminatory intent from "statements of personal opinion . . . reflecting

personal bias or prejudice." (brackets, internal quotes, and citation omitted)); *Deneen v.

Northwest Airlines, Inc.*, 132 F.3d 431, 437 (8th Cir.1998) (affirming jury verdict in favor of

terminated pregnant employee where employer may have "discriminatorily assumed [the

employee] was suffering a condition that would interfere with her job"), *cited with approval in

Laxton*, 333 F.3d at 583–84.[94]

Although Yrrobali testified that in writing the email he acted in good faith, Yrrobali Tr.,

vol. 2, at 206:6–13, the jury may have found that Yrrobali lacked credibility based on other

evidence.  *See Laxton*, 333 F.3d at 582 (considering decisionmaker's credibility as a witness in

pretext analysis).  For example, in the March 14, 2016 email, Yrrobali wrote: "The issue was

*brought to my attention from some of my FTO* (Field Technology Officer) employees and FTO

Joseph Burns'[s] previous supervisor."  Pl.'s Ex. 11 (emphasis added).  Yet, the trial was replete

with testimony that before Yrrobali sent the email, none of the FTOs, including the RVSS team

members, spoke to him about any issues involving Burns's migraines or climbing towers.  *E.g.*,

Yrrobali Tr., vol. 1, at 60:15–62:1; Nunez Tr. at 18:18–19:23; Cervantes Tr. at 11:11–19;

Stevens Tr. 12:1–6.  As another example, Yrrobali wrote: "Mr. Burns did state that he had not

---

[94] *See also Rodriguez v. ConAgra Grocery Prod. Co.*, 436 F.3d 468, 481–82 (5th Cir. 2006) (One
of the primary goals of the ADA is "to prohibit employers from making adverse employment decisions
based on stereotypes and generalizations associated with the individual's disability rather than on the
individual's actual characteristics." (internal quotes and citation omitted)); *Cannon*, 813 F.3d at 591 (The
amended "regarded as" provision, 42 U.S.C. § 12102(3)(A), "reflects the view that unfounded concerns,
mistaken beliefs, fears, myths, or prejudice about disabilities are just as disabling as actual impairments."
(internal quotes and citation omitted)).

brought this up to supervision knowing it might affect his ability to remain a climber."  Pl.'s Ex. 11.  Burns disputed that testimony, explaining that he was not hiding anything from his supervisors and that it was important that they knew about his migraine condition.  Burns Tr. at 24:10–18.[95]  Apodaca corroborated Burns's testimony that he did not hide his migraine condition.  Apodaca Tr. at 26:23–27:7.  The jury could have reasonably concluded that Yrrobali fabricated these statements.

The jury was also presented with the following evidence regarding the Agency's lack of any attempt to verify the report of the safety concern.  Fernandez expected that Yrrobali would verify the report, and he thought that Yrrobali did so before sending the March 14, 2016 email.  Fernandez Tr. at 94:17–20, 97:2–12.  Benn testified that she had the same impression.  Benn Tr. at 29:12–30:14.  However, before he sent the email, Yrrobali made no attempt to verify the report: he did not speak to any of the RVSS crew members or Burns about the report.  Yrrobali Tr., vol. 1, at 60:15-62:1, 82:16–83:12.  He failed to do so—despite that he knew Burns had a clean safety record: Burns was never involved in any climbing accident or unsafe practice.  Yrrobali Tr., vol. 1, at 34:10–21, 35:20–36:18, 39:16–19.  Moreover, Yrrobali testified that when he was an FTO, he experienced nothing that would give him a pause as to climbing towers with Burns.  Yrrobali Tr., vol. 1, at 36:19–37:5.  The RVSS crew members likewise testified that they

---

[95] Burns testified as follows:

Q. [COUNSEL] Did you ever tell -- and I am going to ask you about things he said you said.

Did you ever tell Mr. Yrrobali that you had not brought this up to supervision knowing it might affect your ability to be a climber?

A. [BURNS] No, sir. I've -- everybody knows I have migraines. I've e-mailed my supervisor, my past two supervisors. I was not hiding anything.  If anything, I wanted people to know, because I wanted them to be aware of it.  I thought it was important.

Burns Tr. at 24:10–18.

had no safety concerns about climbing with Burns and experienced no safety incident while climbing with Burns. *E.g.*, Nunez Tr. at 15:12–22, 16:2–17:2; Stevens Tr. at 7:9–12, 8:1–6, 13:9–12.

Considering this evidence, the jury could have reasonably concluded that Yrrobali, and in turn, the Agency, "could not reasonably believe" the report of the safety concern, and therefore, that its proffered reason for restricting Burns's climbing duties was not credible. *Cf. Kopszywa v. Home Depot USA, Inc*., 620 F. App'x 275, 279 (5th Cir. 2015); *cf. also*, *Clark*, 665 F. App'x at 372 (finding no evidence that it was unreasonable for employer to rely upon employee's positive alcohol sample in making its decision to fire her because the employer "'went through a reasoned process' to determine whether there was a plausible account (other than [the employee's] having consumed alcohol) for the positive sample" (quoting *Bailey v. Real Time Staffing Servs., Inc*., 543 F. App'x 520, 524 (6th Cir. 2013)); *see also Bailey*, 543 F. App'x at 524 ("Bailey cannot show pretext if Real Time had an honest belief that he used illegal drugs— that is, if it made a reasonably informed decision before firing Bailey and if its deliberation was not marred by 'an error too obvious to be unintentional.'" (quoting *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ*., 711 F.3d 687, 705 (6th Cir. 2013))).

In sum, "[t]his case was based upon the accumulation of circumstantial evidence and the credibility determinations that were required." *Russell*, 235 F.3d at 229 (internal quotes and citation omitted). The jury was presented with Yrrobali's March 14, 2016 email, which ultimately formed the basis of the Agency's decision, *see Burton*, 798 F.3d at 232 ("[W]e take a snapshot at the moment of the allegedly discriminatory act." (internal quotes and citation omitted)), and it was called upon to determine whether the email contained merely innocuous exaggerations or was tainted with discriminatory animus. It was presented with conflicting

evidence and had to assess the credibility of the witnesses.  The Court concludes that Burns

presented substantial evidence for the jury to reject the Secretary's proffered reason for the

climbing restriction and to find in Burns's favor on the ultimate issue of disability

discrimination.[96]  The Court therefore denies the Secretary's motion for judgment as a matter of

law and his alternative motion for a new trial as to the jury's finding of liability on Burns's

discrimination claims.

## C.  Liability Verdict on Improper Medical Inquiry Claim

The Secretary argues that there is insufficient evidence to support the jury's findings in

favor of Burns on his claim of improper medical inquiry.  Def.'s Suppl. Mot. at 20.  "[T]he

Rehabilitation Act incorporates many of [ADA] Title I's prohibitions on employment

discrimination by reference, including [42 U.S.C.] § 12112(d)(4)(A)'s medical inquiry

prohibition."  *Taylor v. City of Shreveport*, 798 F.3d 276, 283 (5th Cir. 2015); 29 U.S.C. §

791(f).[97]  Section 12112(d)(4)(A) provides:

> A covered entity shall not require a medical examination and shall not make
> inquiries of an employee as to whether such employee is an individual with a

---

[96] The Secretary also argues that Burns failed to show that he was treated less favorably than any similarly situated employee.  Def.'s Suppl. Mot. at 8–9.  Presenting evidence of disparate treatment is simply one alternative way to demonstrate pretext, and in turn, intentional discrimination. *See Laxton*, 333 F.3d at 578 ("A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." (internal quotes and citations omitted)); *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977) ("Proof of discriminatory motive . . . can in some situations be inferred from the mere fact of differences in treatment."); *see also Burns*, 456 F. Supp. 3d at 827 n.48 ("'One possible way to prove nexus' is to show that the plaintiff 'was treated less favorably than non-disabled employees." (brackets and italicized emphasis omitted) (quoting *LHC Grp., Inc.*, 773 F.3d at 696)).  Because Burns has presented sufficient evidence to show that the Secretary's reason is unworthy of credence and therefore pretextual, the Court does not reach the merits of the Secretary's disparate treatment argument.

[97] *See also Menoken v. Dhillon*, 975 F.3d 1, 12 (D.C. Cir. 2020) ("The [Rehabilitation] Act prohibits covered entities, including the EEOC, from 'mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such . . . inquiry is shown to be job-related and consistent with business necessity.'  42 U.S.C. § 12112 (d)(4)(A) (incorporated by reference in 29 U.S.C. § 791(f))." (alterations in original)).

disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).

## 1.  *Plaintiff's Prima Facie Case*

A plaintiff asserting a claim under § 12112(d)(4)(A) "must show (1) that he is an employee of the defendant-employer, and (2) that the defendant-employer . . . made a disability-related inquiry of him."  *Williams v. FedEx Corp. Servs*, 849 F.3d 889, 901 (10th Cir. 2017).  A medical inquiry is disability-related, and therefore, is sufficient to trigger the protection under Title I of the ADA, if the inquiry "may tend to reveal an employee's disability."  *Conroy v. New York State Dept. of Corr. Serv*., 333 F.3d 88, 95 (2d Cir. 2003).[98]

In the April 6, 2016 letter, the Agency asked for Burns's physician, *inter alia*, to provide a "[d]iagnosis of [Burns's] condition(s) and resulting impairment(s)" and explain "the impact [his] condition(s) are having on [his] life activities - both on and off the job, and to what degree those life activities are affected."  Pl.'s Ex. 13.  And in the August 18, 2016 letter, the Agency asked Burns's physician to  provide a "description of [Burns's] current medical status and use of potentially sedating medications" and an opinion as to whether his medical conditions and use of medications impeded his ability to engage in arduous physical activities, including but not limited to, climbing towers, crouching, and crawling, and his ability to respond to off-hours

---

[98] In *Taylor*, where at issue was a claim under § 504 of the RA, unlike, as here, a claim under § 501 of the RA, *Taylor*, 798 F.3d at 282, the Fifth Circuit distinguished *Conroy*, where at issue was an ADA Title I claim, reasoning that "Title I does not contain the Rehabilitation Act's [*i.e.*, § 504 of the RA] sole causation requirement," and "as a result, a medical inquiry that violates Title I will not necessarily violate the Rehabilitation Act [*i.e.*, § 504 of the RA]," *id.* at 285 (citing *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 255 (6th Cir. 2011) (RA, §504 case)).  Because to prevail on a claim under § 504 of the RA, "the plaintiff must ultimately prove that the defendant discriminated against him or her solely on the basis of disability," the panel held "an inquiry into an employee's medical condition violates the Rehabilitation Act [*i.e.*, § 504 of the RA] only if it is 'intended to reveal or necessitates revealing a disability.'" *Id.* at 284 (quoting *Lee*, 636 F.3d at 255).  However, as we have seen, *see* Part III(A), *ante*, in the Fifth Circuit, "the § 501 causation standard and the ADA [Title I] standard are the same," and neither requires "sole causation."  *Pinkerton*, 529 F.3d at 516, 519.

emergencies. Pl.'s Ex. 23.  A reasonable jury could conclude that the inquiries made in these letters would tend to reveal Burns's disability and therefore, are disability-related.[99]

## 2.  *Defendant's Business Necessity Defense*

"Even if the plaintiff makes the required showing, the employer may avoid liability by demonstrating that the . . . disability-related inquiry was job-related and consistent with business necessity."  *Williams*, 849 F.3d at 901; *see also Taylor*, 798 F.3d at 286 ("Business necessity is an affirmative defense.").  A disability-related inquiry of an employee may be job-related and consistent with business necessity "when an employer has a reasonable belief, based on objective evidence, that: (1) [the] employee's ability to perform essential job functions will be impaired by a medical condition; or (2) [the] employee will pose a direct threat due to a medical condition." *EEOC Guidance*, 2000 WL 33407181, at *6.[100]  Whether the medical inquiry was "job-related and consistent with business necessity" is an "objective" inquiry.  *Hannah P. v. Coats*, 916 F.3d 327, 339 (4th Cir. 2019); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010); *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001).

---

[99] *See* Equal Employment Opportunity Comm'n, *Enforcement Guidance: Disability-Related Inquiries & Medical Examinations of Employees Under the Americans With Disabilities Act (ADA)* (2000), 2000 WL 33407181, at *3 [hereinafter, *EEOC Guidance*] (listing as examples of improper medical inquiries, "asking an employee whether s/he has (or ever had) a disability or how s/he became disabled or inquiring about the nature or severity of an employee's disability"; "asking an employee a broad question about his/her impairments that is likely to elicit information about a disability (e.g., What impairments do you have?)"; and "asking an employee whether s/he currently is taking any prescription drugs or medications"); *Lee*, 636 F.3d at 254 ("Obviously, asking an employee whether he is taking prescription drugs or medication, or questions seeking information about . . . mental conditions, or other impairments an employee has or had in the past trigger the ADA's (and hence the Rehabilitation Act's) protections." (brackets, internal quotes, and citations omitted)).

[100] *See also Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 582 (6th Cir. 2014) ("This reasonable belief must be based on objective evidence obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination.  Such a belief requires an assessment of the employee and his/her position and cannot be based on general assumptions." (ellipses, internal quotes, and citation omitted)); *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) ("[T]he individual who decides to [make the medical inquiry] must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business.").

Much of the evidence discussed in Part III(B)(4), *ante*, is applicable here, with one exception: because business necessity is an objective inquiry, the Court "do[es] not resolve any dispute about what [Yrrobali's] subjective motivations were for" making the medical inquiry of Burns. *Hannah P.*, 916 F.3d at 339. Specifically, Benn relied on Yrrobali's March 14, 2016 email in twice recommending that Yrrobali request Burns for medical information and drafted the April 6, and August 18, 2016 letters, to that effect, for Yrrobali to serve on Burns.[101] At the time Yrrobali wrote the email, he knew that Burns suffered from a chronic migraine condition and took unspecified medications for his condition.[102] However, as discussed, Yrrobali's statements about the effects Burns's migraine condition and medications had on him were based on generalized assumptions and his personal belief—all things subjective in nature.[103] *See Bates*, 767 F.3d at 582, *ante* ("This reasonable belief . . . cannot be based on general assumptions." (internal quotes and citation omitted)).

Yrrobali testified what prompted him to ultimately write the March 14, 2016 email was Apodaca informing him that the RVSS people had concerns with Burns's climbing while having migraines.[104] From Yrrobali's perspective, this safety concern allegedly voiced by the RVSS crew was at least a third-hand information. Multiple witnesses, including Yrrobali and Apodaca, testified that Burns had a clean safety record.[105] Yet, no one in the Agency, including, in

---

[101] Benn Tr. at 10:25–11:24, 43:14–19, 44:4–7, 44:24–45:7; Yrrobali Tr., vol. 1, at 84:16–18, 127:24–25; Pl.'s Exs. 12, 13, 23.

[102] Yrrobali Tr. vol. 1, at 37:6–18, 70:8–15, 75:13–17.

[103] *Id.* at 89:24–90:6; Yrrobali Tr., vol. 2, at 38:6–20, 70:8–71:5.

[104] Yrrobali Tr., vol. 1, at 45:12–14, 77:21–23; Yrrobali Tr., vol. 2, at 166:23–167:8; Apodaca Tr. at 10:11–13; *see also* Apodaca Tr. at 10:11–13 (testifying that Molinar relayed the RVSS team's concern about Burns to Apodaca).

[105] *E.g.*, Yrrobali Tr. vol. 1, at 34:10–21, 35:20–36:18, 39:16–19; Apodaca Tr. at 8:13–25.

particular, Yrrobali, Apodaca, and Benn, made any attempt to verify the alleged report of the safety concern—before Yrrobali served the April 6 and August 18, 2016 letters on Burns.[106]

Finally, the jury heard testimony that casts a serious doubt on whether there was any report of safety concern at all. Apodaca testified that the RVSS crew voiced their concerns about Burns to Molinar, and she, in turn, relayed that information to him.[107] But Molinar testified that she never told Apodaca about any report of safety concern regarding Burns.[108] The RVSS team members testified that none of them said anything about Burns's alleged safety issue to Molinar or Apodaca.[109]

On this evidence, the jury could have reasonably concluded that the Agency lacked reasonable belief, based on objective evidence, in making the disability-related inquiries and therefore, that the inquiries were not consistent with business necessity. The Court therefore denies the Secretary's motion for judgment as a matter of law and his alternative motion for a new trial as to the jury's findings on liability in favor of Burns's improper medical inquiry claim.

## D.  Jury Damages Award

Before addressing the Secretary's arguments, the Court recaps factual and procedural background relevant to the damages award. The discriminatory period in this case began and ended, respectively, on April 6, 2016 (when Yrrobali served Burns with the first letter requesting

---

[106] Yrrobali Tr., vol. 1, at 60:15–21, 82:17–23; Apodaca Tr. at 25:2–10; Benn Tr. at 9:7–13, 15:24–16:2, 19:1–21. The *EEOC Guidance* advises that among the "[f]actors that an employer might consider in assessing whether information learned from another person is sufficient to justify asking disability-related questions" includes "how the person learned the information (e.g., directly from the employee whose medical condition is in question or from someone else)." 2000 WL 33407181, at *8. It provides two examples, namely Examples A and B, where the decisionmakers question the employee and/or his co-workers to vet the information's reliability. *Id.* at *8–*9.

[107] Apodaca Tr. at 10:11–13.

[108] Liab. Trial Tr., vol. 4, at 277:21–278:19.

[109] Nunez Tr. at 15:18–16:1; Cervantes Tr. at 11:5–19; Stevens Tr. at 7:7–15, 12:1–6.

medical documentation and restricting him from tower climbing duties) and September 14, 2016

(when Yrrobali served Burns with the third letter reversing the Agency's prior actions).[110]

During this period, Burns could not earn hazard pay for climbing duties.  Burns Tr. 29:17–28:1.

Further, he could not attend the annual climbing recertification class held during that period

because of the climbing restriction then in effect, and consequently, he could not resume his

climbing duties and therefore earn hazard pay until after May 4, 2017, the day on which he

completed the following year's recertification class.  *Id*. at 37:15–16; Joint Ex. at ¶ 25.

Before trial, the parties stipulated that Burns lost hazard pay (back pay) in the amount of

$3,068.56 for the period between April 6, 2016, and May 3, 2017.  Joint Ex. 1 at ¶ 26.  In his

closing argument, Burns's counsel called upon the jury to award him past noneconomic damages

(for past pain and suffering, inconvenience, mental anguish and loss of enjoyment of life) for

approximately four years from April 2016 until "today," that is, February 10, 2020.  Damages

Trial Tr., vol. 3, at 12:9–12, ECF No. 154.  Counsel suggested a total of $200,000 based on

Burns's annual salary: $80,000 (his full salary) for the first year, and $40,000 for each of the

subsequent three years until trial.  *Id.* at 12:11–13:8.  Counsel also argued for future

noneconomic damages.  The jury awarded Burns $125,000 and $0, respectively, for past and

future noneconomic damages.  Verdict Form for Damages at 1.

The Secretary now challenges the sufficiency of evidence supporting the jury's award for

past noneconomic damages.  Specifically, he argues that Burns failed to present sufficient

---

[110] By the September 16, 2016 letter, the Agency rescinded its second letter that sought further medical information and reversed its restriction on Burns's climbing tower with one requirement: Burns must notify Yrrobali if he takes any of the medications Dr. Rampy prescribed and only if he takes them prior to any assignment made by his management or request made by his co-workers—for him to climb or undertake hazardous duties.  Pl.'s Exs. 26, 27.  As Burns states, the requirement mirrors Burns's prior practice dealing with his migraines and medications.  Burns Tr. 15:10–18; *see also* Pl.'s Suppl. Mot. at 11–12 (citing Pl.'s Ex. 10 and Burns Tr. 15:10–18).

evidence to support a finding of a specific and discernable injury and therefore, asks the Court to render judgment as a matter of law in the Secretary's favor (presumably a take nothing judgment). Def.'s Suppl. Mot. at 23–25. Alternatively, he argues that the amount of the jury award is excessive and asks the Court to grant its motion for new trial on damages or remit the amount awarded to a nominal amount. *Id.* at 26–27.

A plaintiff who prevails on a claim for disability discrimination under § 501 of the RA may recover compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. 42 U.S.C. §§ 1981a(a)(2), b(3); 29 U.S.C. § 974a(a)(1).[111] However, compensatory damages for intangible injuries such as emotional harm or mental anguish are not presumed simply because the complaining party is a victim of discrimination. *DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007); *Vadie v. Miss. State Univ.*, 218 F.3d 365, 376 (5th Cir. 2000). To recover more than nominal damages for emotional harm, a plaintiff must provide proof of an "actual injury," that is, a "specific discernable[] injury," resulting from the defendant's discriminatory conduct. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238–39 (5th Cir. 2001) (internal quotes, and citation omitted). Moreover, "[t]hat a plaintiff may be entitled to something beyond nominal damages . . . is not to concede the reasonableness of just any award a jury may assign." *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002). "The question whether th[e] evidence support[s] a [sum

---

[111] *See also Roberts v. Progressive Indep., Inc.*, 183 F.3d 1215, 1222 (10th Cir. 1999) ("Section 1981a provides compensatory and punitive damages for actions brought under § 706 or § 717 of Title VII of the Civil Rights Act of 1964 against entities who engaged in unlawful intentional discrimination under 29 U.S.C. § 791 (§ 501 of the Rehabilitation Act), or § 42 U.S.C. § 12112 (§ 102 of the ADA)."); *Pinkerton*, 529 F.3d at 517 ("[P]laintiffs may bring discrimination claims under § 501 and § 504 [of the RA], but recover monetary relief only under § 501.").

certain] award is an entirely different matter." *Thomas*, 297 F.3d at 371.[112] "An excessiveness

challenge requires more extensive scrutiny." *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360,

364 (5th Cir. 2019).

### 1. Whether Greater Than Nominal Award is Warranted

To demonstrate a specific discernable injury, and therefore, to merit any award greater

than nominal damages, the plaintiff must adduce "competent evidence" to prove, with some

"specificity," the existence, nature, and extent of the alleged injury. *Flowers*, 247 F.3d at 239;

*Giles*, 245 F.3d at 488. "Hurt feelings, anger and frustration are part of life and are not the types

of harm that could support a mental anguish award." *Giles*, 245 F.3d at 488 (brackets, ellipses,

internal quotes, and citation omitted). However, "mental anguish damages may be appropriate

where the plaintiff suffers sleeplessness, anxiety, stress, marital problems, and humiliation."

*Migis v. Pearle Vision, Inc*., 135 F.3d 1041, 1047 (5th Cir. 1998). Emotional harm may also

physically manifest itself as, *inter alia*, "headaches." *Vadie*, 218 F.3d at 377 (internal quotes and

citation omitted).

Competent evidence of emotional harm requires "more than vague allegations," *Thomas*,

297 F.3d at 368, and "conclusory statements," *Miller*, 716 F.3d at 147; it requires "sufficient[]

detail[]," *Migis*, 135 F.3d at 1047. Although "[i]n certain cases a plaintiff's testimony alone may

be sufficient proof of mental [anguish] damages," the court must "scrupulously analyze" an

award "predicated exclusively on the plaintiff's testimony"—because mental anguish is "fraught

with vagueness and speculation, and is easily susceptible to fictitious and trivial claims." *Giles*,

---

[112] *Compare Giles v. Gen. Elec. Co*., 245 F.3d 474, 488–89 (5th Cir. 2001) (holding evidence was sufficient "to allow a jury to award compensatory damages," but not to entitle the plaintiff to the "full" amount awarded, and remitting the amount), *with Picou v. City of Jackson, Miss.*, 48 F. App'x 102, 2002 WL 31016468, at *5 (5th Cir. 2002) (unpublished opinion) ("[H]aving found [plaintiff-employee's] evidence insufficient to support the damages award, we need not reach the [defendant-employer's] other issues: remittitur, the maximum recovery rule, and denial of new trial.").

245 F.3d at 488 (brackets, internal quotes, and citation omitted). "We prefer corroboration and expert testimony." *Thomas*, 297 F.3d at 368.

Here, in support of the emotional harm Burns suffered during the discriminatory period, he testified as follows. During this period, he suffered insomnia, stress, and migraines, all of which got worse than before. Damages Trial Tr., vol. 2, at 8:3–10, ECF No. 153; Burns Tr. at 17:5–8. Specifically, when he received Yrrobali's April 6, 2016 letter, he "ran into a brick wall with confusion, frustration, [and] anger," given that he "always did [his] job," "was always safe," and "cared for [his] fellow employees." Damages Trial Tr., vol. 2, at 4:13–20. The letter caused him "a lot of questioning [him]self . . . , especially [his] abilities even though [he had] done his job in the past with no issues." *Id.* 4:5–13. It caused him "a lot of stress," which, in turn, resulted in increased episodes of headaches and migraines. *Id.* at 4:21, 7:9–11; Burns Tr. at 17:5–10. Stress and fatigue play a factor in triggering his migraine headaches. Burns Tr. at 16:12–25; *see also* Damages Trial Tr., vol. 2, at 8:8–10. After Yrrobali served the August 18, 2016 letter, Burns was afraid and thought his job was on the line, because unlike the April 6, 2016 letter, this letter sought information about not only climbing, but also other job functions. Burns Tr. at 32:5–24, 33:9–14; *see also* Pl.'s Exs. 13, 23; Damages Trial Tr., vol. 2, at 7:23–25. He became more stressed and continued to experience increased migraines, which he described as "the worst pain you could ever feel." Damages Trial Tr., vol. 2, at 7:17–8:17, 9:2–4.

Burns also testified that during the discriminatory period, the Agency's actions affected his sleep and, in turn, caused family problems. *Id.* at 4:19–5:12. He was "more easily agitated" with his girlfriend and his two teenaged sons (the sons lived in Arkansas but were visiting him during summer of 2016). *Id.* at 5:8–9, 5:13–23, 22:1–23:12. He had arguments with his girlfriend and because of that, his younger son did not want to stay with him in El Paso. *Id.* at

5:16–18.  Due to insomnia, he was tired and did not want to go outside and play with his teenage

sons, or take a walk with his girlfriend; he did not want to do anything with his family.  *Id.* at

5:18–23, 20:24–21:16.

Other evidence, including contemporaneous evidence, provides some corroboration of

Burn's testimony.  During the discriminatory period, Burns sought sick leave and took

medications for headaches and visited his neurologist.  Pl.'s Ex. 14, ECF No. 99-14; Pl.'s Exs.

21, 27; Damages Trial Tr., vol. 2, at 7:6–16, 18:16–25, 19:18–20:7.  In an email dated August

23, 2016, Burns complained to his management about the Agency's requests for medical

documentations, stating that "[t]his has been a stressful time both on and off the job in dealing

with this issue."  Pl.'s Ex. 25.  Yrrobali testified that Burns is generally levelheaded, but during

this period and in particular, when Yrrobali served the letters requesting medical

documentations, Yrrobali noticed changes in Burns's mannerism and voice; Burns displayed

confused looks.  Yrrobali Tr., vol. 1, at 165:23–166:7.  He observed that Burns was having a

"stressful time."  Yrrobali Tr., vol. 2, at 74:3–6.

The Fifth Circuit has found that similar evidence supported an emotional distress award

greater than nominal damages.  *See, e.g.*, *DeCorte*, 497 F.3d at 442–43 (finding sufficient proof

of actual injuries in support of various mental anguish awards to multiple plaintiffs, where each

plaintiff testified about personal difficulties experienced after termination, including stress,

sleeplessness, strained family relations, and worsening physical problems, such as high blood

pressure, a bleeding ulcer, and hair loss); *Giles*, 245 F.3d at 488 (finding plaintiff's testimony,

among others, that he "had trouble sleeping, suffered headaches and marital difficulties" and his

co-worker's testimony that he "appeared 'despondent, depressed, down and absolutely utterly

discouraged about not being able to come back to work'" were specific enough to allow a jury to

award compensatory damages); *Oden v. Oktibbeha Cty., Miss.*, 246 F.3d 458, 471 (5th Cir. 2001) (finding evidence including plaintiff's "testimony concerning stress, sleeplessness, betrayal, and shame" sufficient to support the jury's award). The Court finds that there is sufficient evidence to support that at least during the discriminatory period, the Agency's conduct "caused some discernible injury to [Burns's] mental state," *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 402–03 (5th Cir. 2007), manifested as insomnia, stress, and migraine headaches, and therefore, Burns is entitled to an award greater than nominal damages.

Although Burns's evidence of mental anguish during the discriminatory period clears the hurdle to a non-nominal award, the Court addresses his evidence of mental anguish from the period following the Agency's reversal of its prior actions in September 2016 and until trial—which, we will see, is relevant to whether the jury's award is excessive. Burns testified that his "stress, fatigue, worry" continued after the Agency's September 14, 2016 letter. Damages Trial Tr., vol. 2, at 9:8–11. At his counsel's prodding, Burns repeated his October 2018 deposition testimony about the extent to which his migraine episodes increased around that time. *Id.* at 10:10–11:17. He speculated that around October 2018, "[t]hey [*i.e.*, his migraine episodes] increased, I would probably say twice a week, if not maybe twice every couple of weeks." *Id.* at 10:24–11:1. He then testified that experiences migraines at the same rate "now," that is, at the time of trial. *Id.* at 11:16–17.

Burn's testimony that his stress continued following the Agency's September 2016 reversal of its prior actions is not "sufficiently detailed." *Migis*, 135 F.3d at 1047. That he continued to suffer increased migraines was to date, in essence, his counsel's testimony, not his. *See Brady v. Fort Bend Cty.*, 145 F.3d 691, 720 (5th Cir. 1998) (observing that "[t]o a large extent, it was the Plaintiffs' attorneys, and not the Plaintiffs themselves, who testified on the

mental damages issue").  That testimony suggests that following the September 2016 and until

trial, Burns experienced 4-8 episodes of migraine headaches per month or 48-96 episodes per

year; that is approximately 5-10 times greater than the number of episodes (ten) he suffered

annually before the 2016 events.  Burns Tr. at 16:12–22.  He failed to provide any corroborating

evidence in support of that speculative testimony.  The Secretary points out, *see* Def.'s Suppl.

Mot. at 25, that although during the one-year period before April 2016, Burns made ten requests

for sick leave because of migraines, headaches, and doctor's visits, *see* Pl.'s Ex. 10; Burns Tr. at

24:23–25:4, he provided no evidence that he took such a leave following the Agency's

September 16, 2016 letter.  Pl.'s Ex. 27; Damages Trial Tr., vol. 2, at 19:3–11.

Finally, and crucially, Burns failed to attribute his stress and migraines during this latter

period to the Agency's conduct that formed the basis of his claims but ceased approximately

three and a half years before the trial began.  *See DeCorte*, 497 F.3d at 442 (The plaintiff must

prove that he was "affected by the discriminatory conduct."); *Thomas*, 297 F.3d at 371 (remitting

jury award for future emotional distress, observing that "[the plaintiff] testified about a heart

condition that bothers her to this day.  But she never even stated that she believes that [the

defendant's] actions had lasting effects on her cardiac health; she certainly does not present any

medical evidence connecting her past job-related stress to her current physical condition").

Instead, his concern was that "this can happen again."  Burns Tr. at 33:3; *see also* Damages Trial

Tr. at 9:16–17 ("I thought the problem could come back.").

Consequently, although Burns presented sufficient evidence to show that he suffered

some specific discernable emotional injuries during the discriminatory period, his testimony

alone is inadequate to show that he continued to suffer such injuries as a result of the Agency's

past actions during the period between September 2016 and trial.  *Cf. Flowers*, 247 F.3d at 239

(vacating jury award for emotional damages where the jury found employer liable for disability-based harassment, but not termination, and the only evidence of injury plaintiff presented at trial "was of events that occurred after she was terminated . . . , evidence that is irrelevant to the question of actual injury stemming from the harassment").

## 2. Excessiveness and Remittitur

"[W]hen a district court believes a verdict is excessive, it may condition a denial of a new trial on the plaintiff's filing a remittitur of a stated amount." *Evers v. Equifax, Inc*., 650 F.2d 793, 797 (5th Cir. Unit B 1981). "A verdict is excessive if it is contrary to right reason[,] . . . entirely disproportionate to the injury sustained," *Eiland v. Westinghouse Elec. Corp*., 58 F.3d 176, 183 (5th Cir. 1995) (internal quotes and citation omitted), or is "so large as . . . clearly exceeding that amount that any reasonable man could feel the claimant is entitled to," *Foradori*, 523 F.3d at 504 (brackets, internal quotes, and citation omitted)). In determining whether an award is excessive and if so, the size of the remittitur, the Fifth Circuit uses the so-called "maximum recovery rule," a judge-made rule. *Longoria*, 932 F.3d at 365; *Giles*, 245 F.3d at 488; *Puga v. RCX Sols., Inc*., 922 F.3d 285, 297 (5th Cir. 2019); *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002). The rule "prescribes that the verdict must be reduced to the maximum amount the jury could properly have awarded." *Brunnemann v. Terra Int'l, Inc*., 975 F.2d 175, 178 (5th Cir. 1992).

In evaluating the maximum amount a jury could have awarded, courts look to past awards approved in "factually similar cases" in the "relevant jurisdiction"—which, for federal discrimination law, is the Court of Appeals for the Fifth Circuit. *Salinas*, 286 F.3d at 831. The past awards are adjusted for inflation. *Longoria*, 932 F.3d at 365. "[T]o avoid substituting our opinion for that of the jury, [courts] often . . . appl[y] a multiplier, or percentage enhancement,"

which is 150%. *Salinas*, 286 F.3d at 831 & n.7. While "factually similar cases 'provide an objective frame of reference, . . . they do not control our assessment of individual circumstances.'" *Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp.*, 586 F. App'x 643, 650 (5th Cir. 2014) (quoting *Moore v. M/V ANGELA*, 353 F.3d 376, 384 (5th Cir. 2003)).

Although the Fifth Circuit has "approved six-figure emotional distress awards" in employment discrimination cases, *Thomas*, 297 F.3d at 369–70 (surveying prior award cases), in searching for cases that may be factually similar to this case, the Court emphasizes three circumstances of this case: the discriminatory period ended with the Agency reversing its prior actions made the basis of Burns's claims (*i.e.*, the request for medical information and climbing restriction); that period lasted for about five months, ending long before trial; and as discussed, Burns's evidence, though is sufficient to show that the Agency's actions caused him to suffer some specific discernable emotional injuries during the discriminatory period, is insufficient to show that he continued to suffer such injuries following the discriminatory period and until trial.[113]

In its own research,[114] the Court has found two cases that appear to be factually most similar to the present case. The first is *Zamora v. City of Houston*, 798 F.3d 326 (Fifth Cir.

---

[113] In applying the "maximum recovery rule," the Fifth Circuit has considered a variety of factual and procedural distinctions between a case at hand and a prior award case. *E.g.*, *Puga*, 922 F.3d at 298 & n.13 (negligence action) (finding a prior award case "not factually similar" for purposes of loss of past consortium damages because in the instant case, unlike the prior case, the primary victim lived); *Moore*, 353 F.3d at 384–85 (wrongful death action) (finding prior award cases "not factually similar" for purposes of loss of consortium damages because "[p]aintiff herein lost no other family member from this accident, and that she and [the primary victim] had no dependent children"); *Vogler v. Blackmore*, 352 F.3d 150, 157 n.7 (5th Cir. 2003) (wrongful death action) (finding that prior cases were not factually similar because they did not distinguish between past and future mental anguish damages).

[114] The Secretary has not pointed the Court to any case on the excessiveness issue, much less any factually similar case. Moreover, although the Secretary sets out the applicable laws in his brief, his arguments on excessiveness consist of two conclusory statements without any analysis. Def.'s Suppl. Mot. at 25–27 ("The amount of the verdict is so unreasonable as to be entirely disproportionate compared

2015), *aff'g in part and rev'g in part* No. H-07-cv-4510, 2014 WL 11310160 (S.D. Tex. Jan. 30, 2014) [hereinafter *Zamora Dist. Ct. Op.*].  There, the defendant City issued untruthfulness citations against the plaintiff, a police officer with the City's police department, and suspended him for ten days without pay.[115]  Five months later, an independent arbitrator found that the citations were baseless, overturned the suspension, and awarded the plaintiff his lost back pay.[116]  At a jury trial held more than two years after the arbitrator's decision, the jury found that the City suspended the plaintiff in retaliation for his protected activity, and awarded him $23,000 (today's equivalent of approximately $25,000) for past mental anguish and reputational damages.[117]  In upholding the jury award, the Fifth Circuit noted that the plaintiff's father testified as to mental anguish and depression that the plaintiff suffered "between his suspension and the arbitrator's reversal of the suspension" and several witnesses testified that his reputation was harmed after he was branded untruthful or a liar.  *Zamora*, 798 F.3d at 335–36.  Although the Fifth Circuit did not elaborate on the father's testimony, according to the lower court's opinion, the father testified that when the police department cited the plaintiff for being untruthful, "he was very upset, became depressed about it and complained quite a bit to his father, expressing his concern that his career was pretty much ruined." *Zamora Dist. Ct. Op.*, 2014 WL 11310160, at *10 (internal quotes and citation omitted).

---

to the Plaintiff's purported injury."); *id.* at 27 ("In the case at bar, Plaintiff presented no evidence that the alleged discrimination was the proximate cause of any of his injuries.").

[115] *Zamora*, 798 F.3d at 329; *Zamora Dist. Ct. Op.*, 2014 WL 11310160, at *2.

[116] *Zamora*, 798 F.3d at 330.  The plaintiff was cited and suspended on November 15, 2010, and the arbitrator decided on April 28, 2011.  *Zamora Dist. Ct. Op.*, 2014 WL 11310160, at *2.

[117] *Zamora*, 798 F.3d at 330, 335.  As the verdict was returned in September 2013, *see Zamora Dist. Ct. Op.*, 2014 WL 11310160, at *2, the Court has adjusted the award to account for inflation using the CPI Inflation Calculator from the Bureau of Labor Statistics, available at https://data.bls.gov/cgi-bin/cpicalc.pl.  *See Puga*, 922 F.3d at 298 & n.12.

The second case is *Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, *ante*.  There, after the plaintiff, a correctional officer at one of the defendant's prison units, filed EEOC complaints, the defendant denied her application for promotion to a captain position and her subsequent repeated applications for transfer to other positions outside of her unit.[118]  Following a jury trial, the jury found that the defendant retaliated against the plaintiff by failing to promote her and refusing to transfer her.[119]  On remand from the Fifth Circuit, a second trial was held on compensatory damages.[120]  By this time, the defendant had transferred her to another prison unit.[121]  The second jury awarded her $30,000 (today's equivalent of approximately $45,000) for past emotional distress and $100,000 for future emotional distress; a second appeal followed.[122]  The Fifth Circuit noted that the plaintiff presented evidence of "severe past emotional distress" that she suffered "[a]fter the promotion denial and throughout the retaliatory period" and the jury concluded "this evidence of *past* emotional harm warranted $30,000 in damages."  *Thomas*, 297 F.3d at 370 (emphasis in original).  That evidence included testimony, among others, that during the retaliatory period,[123] the plaintiff "could not sleep and suffered from nausea"; her "depression

---

[118] *Thomas*, 297 F.3d at 366.

[119] *Id.* at 365 & n.1.

[120] *Id.* at 365.

[121] *Id.* at 370.

[122] *Id.* at 363.  The defendant appealed the future emotional distress award, but not the past emotional distress award.  However, in assessing the excessiveness of the former, the Fifth Circuit thoroughly discussed the evidence of past emotional distress, implicitly approving the $30,000 amount.

[123] The Fifth Circuit's opinion explains that the "retaliatory period" began with "the promotion denial," *id.* at 370, which occurred in November 1996, *id.* at 364, but it does not elaborate on when "the retaliatory period" ended.  The court's discussion of the evidence suggests that the period ended when the plaintiff was transferred to another unit.  *See id.* at 370 (noting that the plaintiff's brother testified that she became depressed "during her employment at the Estelle Unit," which was the unit where she was subjected to retaliatory conduct and from which she was later transferred).  She was transferred sometime before the second trial, *id.*, which was held in November 2000, *see* Br. of Appellee, *Thomas*, 2001 WL

deepened"; and she became "moody" "standoffish," "withdrawn," and "prone to breaking out in tears." *Id.*

The Court finds that the jury's award of $125,000 for past noneconomic damages is clearly excessive relative to the past awards in *Zamora* (approximately $25,000 with inflation adjustment) and *Thomas* (approximately $45,000 with inflation adjustment). In determining the appropriate amount of remittitur, the Court considers two additional circumstances of this case. *See Thompson v. City of Tupelo*, 268 F.3d 1064, 2001 WL 878055, at *2 (5th Cir. 2001) (unpublished) (reemitting noneconomic damages award to a lesser extent ($250,000 in remittitur) than the remittitur in a prior award case ($290,000 in remittitur) because of a case-specific fact, that is, that unlike the plaintiff in the prior case, the plaintiff in the case at hand "lost her job"). First, Burns testified that as a result of the Agency's conduct, he suffered increased episodes of migraine headaches during the discriminatory period and those headaches were painful; however, similar evidence was lacking in *Zamora* and *Thomas*.[124]  *E.g.*, Damages Trial Tr., vol. 2, at 7:17–8:17, 9:2–4; *cf. Doyle v. Landry*, 67 F. App'x 241, 2003 WL 21108477, at *7 & n.8 (5th Cir. 2003) (unpublished) (distinguishing prior cases awarding as high as $100,000, noting that "in those cases, the plaintiffs experienced other serious manifestations, often physical in nature, as a result of their distress").

---

34121379, at *4 (5th Cir. Nov. 5, 2001). Specifically, in October 1998 (days after the first trial concluded), the district court ordered the defendant to immediately transfer the plaintiff away from her unit to ensure that no retaliation occurred. *Thomas v. Texas Dep't. of Criminal Justice*, 220 F.3d 389, 392 (5th Cir. 2000) (decision on the first appeal); Order Enjoining & Restraining Conduct – Interim, *Thomas v. Texas Dep't. of Criminal Justice*, No. H-97-0452 (S.D. Tex. Oct. 13, 1998), ECF No. 78; *see also* Br. of Appellee, 2001 WL 34121379, at *5 (discussing the district court's order).

[124] The lower court in *Zamora* noted that although the plaintiff there testified that he suffered from migraines, he failed to testify that the defendant's relevant conduct "caused or exacerbated the headaches" and thus failed to "specifically attribute those symptoms" to defendant's conduct. *Zamora Dist. Ct. Op.*, 2014 WL 11310160, at *10.

Second, other than the letters requesting medical documentations, Burns had no issues with Yrrobali; Yrrobali gave him no hint that he could be disciplined or fired; Burns always had a good relationship with Yrrobali; and Yrrobali gave him positive quarterly performance evaluations and recommended him for performance awards, including cash rewards in the highest range—the most recent of which occurred in January 2020.  Damages Trial Tr. at 20:8–19; Burns Tr. at 10:6–13, 53:13–55:21; *see also* Yrrobali Tr., vol. 1, at 166:11–167:21; Yrrobali Tr., vol. 2, at 180:1–11; *cf. Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254, 262 (5th Cir. 1999) (considering defendant's overall conduct in excessiveness analysis, stating "we cannot say that an award of $100,000 for mental anguish resulting from malicious discrimination in violation of the ADA is enough to 'shock the conscience' of this Court").

Considering Burns's evidence in toto, in light of the awards in *Zamora* and *Thomas*, the Court finds that the jury properly could have awarded at most $60,000 for his past pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.  The maximum recovery rule requires the Court to add 50%; so, the Court offers Burns a remittitur of the jury award to $90,000.

### 3.   *Effects of The Secretary's Notice of Appeal and Further Proceedings*

Because the Court offers the remittitur, it would have to give Burns an opportunity to notify the Court whether it accepts the remittitur or wishes to proceed to a new trial on damages. *See Foradori*, 523 F.3d at 503 ("[T]he court may not reduce the amount of damages without giving the plaintiff the choice of a new trial, for to do so would deprive the parties of their constitutional right to a jury.").  There is, however, a minor wrinkle: While the instant motion was pending, the Secretary appealed from the Court's final judgment.  As mentioned, the Court

entered final judgment on February 25, 2020; the Secretary filed the instant motion on March 24, 2020; and thereafter, the Secretary filed the notice of appeal (ECF No. 23) on April 24, 2020.

"It is the general rule that a district court is divested of jurisdiction upon the filing of the notice of appeal with respect to any matters involved in the appeal." *Alice L. v. Dusek*, 492 F.3d 563, 564 (5th Cir. 2007) (internal quotes and citation omitted).[125]  The Federal Rule of Appellate Procedure 4 provides:

> If a party files a notice of appeal after the court announces or enters a judgment--but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

Fed. R. App. P. 4(a)(4)(B)(ii).  Two of the motions listed in Federal Rule of Appellate Procedure 4(a)(4)(A) are a motion for judgment as a matter of law and a motion for new trial, respectively, under Federal Rules of Civil Procedures 50(b) and 59.  Fed. R. App. P. 4(a)(4)(A).  The Fifth Circuit has held that "the timely filing of a motion listed in Rule 4(a)(4)(A) suspends or renders dormant a notice of appeal until all such motions are disposed of by the trial court," and therefore, the district court continues to have jurisdiction to decide such a timely filed motion. *Ross v. Marshall*, 426 F.3d 745, 751–52 (5th Cir. 2005).

Because the Secretary's instant motion was filed timely, the Court believes that the following course of proceedings is appropriate.  For now, the Court will conditionally deny the Secretary's motion for new trial on damages and order Burns to notify the Court within 14 days of this memorandum opinion and order—whether it accepts the remittitur or instead, wishes to proceed to a new trial on compensatory damages (*i.e.*, noneconomic damages).  If Burns does accept the remittitur, the Court will then amend the final judgment, in accordance with this

---

[125] *See also Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.").

memorandum opinion and order; however, if he does not, the Court will schedule a new trial on compensatory damages—after, and subject to, the Fifth Circuit's decision on appeal.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART** the Secretary's "Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial and Motion for Remittitur" (ECF No. 119), as supplemented by his "Supplemental Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial and Motion for Remittitur" (ECF No. 146).

Specifically, the Court **DENIES** in all respects the Secretary's motion for judgment as a matter of law and **DENIES** his motion for new trial as to liability.  Further, the Court **DENIES** the Secretary's motion for a new trial as to damages and in the alternative, motion for remittitur **ON THE CONDITION** that Burns accept a **REMITTITUR** of **$35,000** of the jury's award for past pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life (*i.e.,* accept **$90,000** in damages rather than $125,000).

**IT IS FURTHER ORDERED** that within **14 days** of the date of this memorandum opinion and order, Burns **SHALL FILE** a written notice advising the Court whether he accepts the remittitur or seeks a new trial on compensatory damages.

So ORDERED and SIGNED this __8th__ day of December 2020.

_____
**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**